A98A0204, A98A0205. BODYMASTERS SPORTS INDUSTRIES, INC. v. WIMBERLEY; and vice versa.
(501 SE2d 556)

BLACKBURN, Judge.

On March 30, 1996, Candice J. Wimberley was injured while using an inverted leg press machine manufactured by Bodymasters Sports Industries, Inc. She sued Bodymasters, asserting claims under OCGA § 51-1-11 for defective product design and failure to warn, as well as a claim for breach of the implied warranty of fitness for a particular purpose under OCGA § 11-2-315. The trial court granted Bodymasters' motion for summary judgment on the claim for breach of implied warranty, but denied its motion for summary judgment on the other claims. The parties appeal each of these rulings.

"When reviewing the grant or denial of a motion for summary judgment, this Court conducts a de novo review of the law and the evidence. . . . [T]he opposing party should be given the benefit of all reasonable doubt, and the court should construe the evidence and all inferences and conclusions therefrom most favorably toward the party opposing the motion." *Adams v. Sears, Roebuck & Co.*, 227 Ga. App. 695, 696-697 (1) (490 SE2d 150) (1997).

The relevant facts are as follows. Wimberley joined the Sportslife health club in 1992, and worked out four to six times a week over the next four years. She began using the Bodymasters leg press machine as part of her normal exercise routine around May 1994. She used the machine in order to strengthen her left knee, which had been weakened in a childhood injury and had required about 29 surgeries over the years.

The inverted leg press machine may be used for calf exercises or for quadricep/hamstring exercises. For calf exercises, the lifter places free weights in whatever amount she desires onto the bar, then sits in an adjustable seat tilted backward so that she is facing slightly upward and her legs are raised. She then places her feet on a rectangular metal plate, with raised traction lines, connected to the weight bar and pushes the plate up until her legs are almost fully extended and thereafter raises and lowers the weights by flexing her ankles. She then accomplishes her routine by repeating the exercise. A

sticker affixed to the machine concerning this particular exercise reads: "CAUTION — HANDLES MUST BE IN LOCKED POSITION *WHEN DOING CALF EXERCISES.*" (Emphasis supplied.)

When setting up the machine to do the quadricep/hamstring exercises, it is necessary to remove the pin that otherwise prevents the plate from descending closer than approximately 33 inches from the seat. The removal of the pin is a part of the design of the equipment to permit the performance of the quadricep exercises. In performing the quadricep exercise, the user assumes the same position as for the calf exercises. She then pushes the plate up with her feet, lets the plate descend toward her body as far as she desires, and then repeats the exercise. The machine does not have a series of safety pin holes into which the pin could be inserted by the user to prevent the full force of the falling weights from crashing onto the user's legs forcing them to hyperflex, or other safety device. At the time of the injury, Wimberley was aware that there was no safety mechanism to stop the descent of the weights while in the quadricep/hamstring mode.

On the date of the injury, Wimberley began her normal exercise routine at about 7:00 a.m. After using several other machines, she proceeded to use the inverted leg press. After putting 200 pounds of weight on the machine, Wimberley converted the machine to the quadricep mode by removing the pin. While pushing the plate upward, her feet slipped down the plate, causing the entire weight to be supported by the balls of her feet, which were unable to bear the weight. As a result, her legs were forced down rapidly toward her chest, causing a hyperflexion of the knee and fracturing her patella. At no point did the plate or weights actually strike her knee.

*Case No. A98A0204*

1. *Design defect.* (a) In her design defect claim, Wimberley alleges that the machine was defectively designed because it was not equipped with a "dead man" lock that would stop the weights from descending so far as to force a user's knees to her chest if her foot slips from the foot plate while in the quadricep mode. Bodymasters contends that this defect was open and obvious, and that the trial court erred in holding that the open and obvious doctrine is no longer an absolute defense to a design defect claim following the Supreme Court's decision in *Banks v. ICI Americas*, 264 Ga. 732 (450 SE2d 671) (1994). For the reasons discussed below, this contention is without merit and the trial court did not err in this regard.

Prior to *Banks*, Georgia courts held that an injured party could not recover in a design defect case where the defect was open and obvious. See *Weatherby v. Honda Motor Co.*, 195 Ga. App. 169, 170

(393 SE2d 64) (1990). The open and obvious doctrine was not applied as an affirmative defense, however, but went to the issue of whether the product was "defective" in the first instance. Id. at 170-171; see also *Raymond v. Amada Co., Ltd.*, 925 FSupp. 1572, 1578 (N. D. Ga. 1996). The rationale for the doctrine was that "a product is not defective if the absence of a safety device is open and obvious." *Weatherby*, supra at 170. In applying the doctrine, "the decision is made on the basis of an objective view of the product, and the subjective perceptions of the user or injured party are irrelevant." Id. at 171.

In *Banks*, the Supreme Court rejected the proposition that a product is not defective where it is "reasonably suited for its intended purpose and where the presence or absence of a design feature [does] not prevent the product from functioning properly in its intended use." (Punctuation omitted.) *Banks*, supra at 733 (1), overruling *Mann v. Coast Catamaran Corp.*, 254 Ga. 201 (326 SE2d 436) (1985). The court instead adopted a "risk-utility" analysis to be used in evaluating design defect cases, "whereby the risks inherent in a product design are weighed against the utility or benefit derived from the product." *Banks*, supra at 734 (1). The court identified several factors relevant to such an analysis, including "the usefulness of the product; the gravity and severity of the danger posed by the design; the likelihood of that danger; the avoidability of the danger, i.e., the user's knowledge of the product, publicity surrounding the danger, or the efficacy of warnings, as well as common knowledge and the expectation of danger; the user's ability to avoid danger; the state of the art at the time the product is manufactured; the ability to eliminate danger without impairing the usefulness of the product or making it too expensive; and the feasibility of spreading the loss in the setting of the product's price or by purchasing insurance . . . the feasibility of an alternative design; the availability of an effective substitute for the product which meets the same need but is safer; the financial cost of the improved design; and the adverse effects from the alternative." Id. at 736-737, n. 6.

Although *Banks* did not expressly address the open and obvious doctrine, the clear import of the decision is that no one factor absolutely controls the analysis as to whether a product is defective. Indeed, *Banks* identifies "the user's knowledge of the product," "common knowledge and the expectation of danger," and "the user's ability to avoid danger" as several factors to be included in the analysis, without indicating that any of such factors is controlling. Accordingly, it is clear that under *Banks*, the open and obvious nature of the danger is but one factor to be considered in determining whether a product is defective. See *Raymond*, supra, 925 FSupp. at 1578 (concluding that *Banks* impliedly overruled the open and obvious doctrine in design defect cases). See also Maleski, Eldridge's Georgia

Law of Products Liability, § 6B-3 at 62 (Supp. 1991) ("In jurisdictions that emphasize a policy of risk-utility balancing, the fact that some defect is open and obvious is merely one element to be weighed against all other relevant factors").

Therefore, even assuming that the danger posed by the leg press machine was open and obvious, this factor is not dispositive as to whether the machine was defective, and Bodymasters was not entitled to summary judgment on the design defect claim on this ground.

(b) Bodymasters also argues that it was entitled to summary judgment on the design defect claim because there was no issue of material fact as to whether the machine was defective. In particular, Bodymasters argues that Wimberley presented no evidence that an alternative design was possible or would have made the machine safer. However, although *Banks* identifies the existence of an alternative design as one factor affecting the risk-utility analysis, it does not indicate that such factor is controlling. See *S K Hand Tool Corp. v. Lowman*, 223 Ga. App. 712, 715 (479 SE2d 103) (1996) ("*Banks* . . . requires the balancing of several factors which relate to the risks and benefits of products, and no one factor alone is a prerequisite for bringing a claim"). Moreover, although Bodymasters contends that the leg press machine functioned as intended, *Banks* expressly rejected the proposition that such fact is controlling in determining whether a product is defective. *Banks*, supra. Accordingly, this enumeration is without merit.

(c) Bodymasters also claims that it was entitled to summary judgment because Wimberley assumed the risk of injury as a matter of law. As an initial matter, we note that the affirmative defense of assumption of the risk is separate and distinguishable from the open and obvious doctrine. "The distinction between the two is that the open and obvious rule considers whether the danger was objectively obvious in order to determine whether the product is defective. See [*Weatherby*, supra at 171]. On the other hand, the assumption of the risk analysis depends upon whether the particular plaintiff was subjectively aware of the dangerous aspect of the product and unreasonably used it anyway." *Raymond*, supra at 1578. In *Sharpnack v. Hoffinger Indus.*, 223 Ga. App. 833, 834-835 (1) (479 SE2d 435) (1996), a full-court decision, this Court held that, notwithstanding *Banks*' adoption of a risk-utility analysis, assumption of the risk remains a valid defense to a design defect action.

"The defense of assumption of the risk of danger applies when the plaintiff, with a full appreciation of the danger involved and without restriction of his freedom of choice either by the circumstances or by coercion, deliberately chooses an obviously perilous course of conduct. A defendant asserting an assumption of the risk defense must establish that the plaintiff (1) had knowledge of the

danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed himself to those risks. . . . The knowledge requirement does not refer to a comprehension of general, non-specific risks. Rather, the knowledge that a plaintiff who assumes the risk must subjectively possess is that of the specific, particular risk of harm associated with the activity or condition that proximately causes injury." (Citations and punctuation omitted.) *Cornwell v. Chambers of Ga.*, 228 Ga. App. 64, 65 (491 SE2d 132) (1997). "Whether a party assumed the risk of his injury is a jury question that should not be decided by summary adjudication unless the defense is conclusively established by plain, palpable and undisputed evidence." (Punctuation omitted.) Id. at 66.

In this case, Wimberley admitted that she knew wet shoes could slip. She testified that she toweled off her shoes and believed that they were dry. Wimberley admitted that she knew the machine, by design, was not equipped with a dead-man device in the quadricep mode at the time of the accident. However, knowledge of the lack of a safety device does not necessarily equate to assumption of the risk. In order to assume the risk, the injured party "must not only know of the facts which create the danger, but he must comprehend and appreciate the nature of the danger he confronts. A defect and the danger arising from it are not necessarily to be identified, and a person may know of one without appreciating the other." (Punctuation omitted.) *Beringause v. Fogleman Truck Lines*, 200 Ga. App. 822, 824 (4) (409 SE2d 524) (1991). Furthermore, "[a] general awareness that a descending piece of machinery without a safety device will crush what is beneath it is not enough for [p]laintiff to assume the . . . risk." *Raymond*, supra at 1579-1580. The record does not conclusively establish that Wimberley fully comprehended the danger posed by using the machine. Accordingly, whether she assumed the risk is a matter for the jury to resolve, and the trial court did not err in its ruling in this regard.

2. *Failure to warn.* In her failure to warn claim, Wimberley asserts that Bodymasters negligently failed to post warnings on the machine advising users that moisture on the bottom of their shoes could cause their feet to slip off the foot platform, thereby exposing them to an increased risk of injury. However, as discussed above, Wimberley admitted that she knew her shoes were wet and that wet shoes could slip from the foot platform. Indeed, she wiped the bottoms of her shoes with a towel immediately before using the leg press machine in an attempt to remove the moisture she knew was present, precisely because she was aware that wet shoes could slip. Accordingly, since she was aware of the danger she claims she should have been warned against, the failure to post signs warning of such danger could not have been the proximate cause of her injury. See

*Hunt v. Harley-Davidson Motor Co.*, 147 Ga. App. 44, 45 (2) (248 SE2d 15) (1978) (no duty to warn of product-connected danger of which person who claims to be entitled to warning has actual knowledge). Therefore, the trial court erred in denying Bodymasters' motion for summary judgment on this claim.

*Case No. A98A0205*

3. *Implied warranty.* Wimberley appeals the trial court's grant of Bodymasters' motion for summary judgment on her claim for breach of the implied warranty of fitness for a particular purpose under OCGA § 11-2-315. In this claim, she asserts that the lack of a deadman lock rendered the leg press machine unfit for the purpose intended.

Wimberley's claim for breach of warranty must fail because of lack of privity between herself and Bodymasters. OCGA § 11-2-318 provides that "[a] seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume, or be affected by the goods and who is injured in person by breach of the warranty." As Wimberley does not fall into any of these categories, she may not avail herself of the seller's implied warranties.

We note that this claim is separate from the tort claims discussed above. The strict liability statute, OCGA § 51-1-11 (b) (1), provides that a manufacturer of goods is liable in *tort*, irrespective of privity, to persons injured because the property was not merchantable and reasonably suited to the use intended.

*Judgments affirmed in part and reversed in part. McMurray, P. J., and Eldridge, J., concur.*

DECIDED APRIL 13, 1998.

*Jennings & Sparwath, Stephen H. Sparwath,* for appellant.
*Marvin C. Berkowitz, Charles F. Fenton III,* for appellee.