John GULLOCK and Sandi Gullock, Plaintiffs,

v.

SPECTRUM SCIENCES AND SOFTWARE, INC., Defendant.

Spectrum Sciences and Software, Inc., Third–Party Plaintiff,

v.

United States of America, Third–Party Defendant.

No. 7:99–CV–39 (WDO).

United States District Court, M.D. Georgia, Valdosta Division.

May 29, 2001.

---

4. *See* Plaintiff's Response, page 7.

Christopher B. Lyman, Atlanta, GA, Gregg E. McDougal, Augusta, GA, William Pope Langdale, III, Valdosta, GA, for John Gullock, Sandi Gullock, plaintiffs.

Robert M. Clyatt, Valdosta, GA, for Spectrum Sciences and Software, Inc., defendants.

### ORDER

OWENS, District Judge.

Plaintiffs allege that Defendant Spectrum Sciences And Software, Inc. ("Spectrum") is liable for injuries Plaintiff John Gullock ("Gullock") sustained during the course of Gullock's employment at Moody Air Force Base ("Moody") on September 11, 1997. Gullock and his wife seek redress for Spectrum's alleged negligence and strict liability. Plaintiffs also seek compensation for Mrs. Gullock's alleged loss of consortium. Spectrum has brought a third-party action against the United States, seeking compensation for any amount that Spectrum might be found liable to Plaintiffs.

Before the Court are the following motions: Spectrum's motion for summary judgment; Plaintiffs' motion for partial summary judgment; the motion for summary judgment by Third–Party Defendant United States of America; and Spectrum's motion to strike.

### I. Facts

John Gullock worked as a civilian employee of the United States Air Force

("USAF") at Moody. Moody is located near Valdosta, Georgia, and is operated by the USAF 347th Tactical Fighter Wing. Adjacent to Moody on its east side is the USAF Grand Bay Air-to-Surface Weapons Range (the "range") which is approximately 5,900 acres in area. Moody and the range are located entirely on government-owned property.

Aircraft from Moody used the range to practice delivering various types of ordnance at ground targets. A contractor, Spectrum, scored the deliveries based on accuracy and transmitted this information to the pilots. The impact area where the range's targets are located, is near the center of the 5,900 acre range and is 350 acres in area. The ground targets consist of hollowed-out vehicles, mock ups of anti-aircraft weapons, and large circular bull's-eyes.

Gullock worked and continues to work, as a civil engineer in Moody's environmental division. On September 11, 1997, at approximately 1:40 P.M., a fellow civilian employee and Gullock were conducting an environmental compliance inspection traveling on a range road known as Crash Trail Six when a 20mm projectile struck Gullock in the chest.[1] This projectile had been fired from a USAF F-16 fighter jet that had been conducting a strafing run on the range.[2] Gullock suffered severe injuries as a result.

Crash Trail Six is a dirt road that runs generally in north-south direction in the vicinity of the impact area of the range. There were no gates or fences controlling or restricting access from Moody to Crash Trail Six on September 11, 1997. (Garri-

son Dep. (Oct. 7, 1999) at 14; Knobloch Dep. at 35–36.)

At the time of the incident Spectrum had contracted with the USAF to run the range. The contract governing their relationship was the third of three consecutive contracts. The USAF awarded Spectrum its first contract on August 10, 1987, and this contract governed Spectrum's range operations until the second contract became effective. The USAF awarded Spectrum the second contract on October 27, 1992, and this contract governed range operations until a third became effective. The third contract (the "contract") was executed on March 29, 1996. It went into effect on April 1, 1996 (Contract at 1), and was still in effect on September 11, 1997. Spectrum no longer holds the contract to run the range.

## A. Spectrum's Contractual Obligations

Generally, Spectrum's operations consisted of communicating with the aircraft using the range, scoring the events, (Myrick Dep. (Jan. 26, 2000) at 73), and maintaining and policing the range.

## 1. Scope Of Work

Under the heading of "Scope of Work", the contract provided a general description of Spectrum's obligations:

The contractor shall provide all personnel, equipment, tools, materials, supervision, administration, and other items and services necessary to perform the operation and maintenance of the USAF Grand Bay Air-To-Surface

---

1. The 20mm shell that struck Gullock is known as a PGU-27.

2. To strafe means to attack with machine gun fire from a low-flying aircraft. *Webster's II New Riverside University Dictionary* 1144 (1988).

Weapons Range (hereinafter referred to as the Grand Bay Range or the Range) as defined in this performance work statement (PWS), except as specified in Section C–3 as government-furnished property and services at Moody Air Force Base (MFB), Georgia. The contractor shall perform to the standards in this contract. . . .

(Contract § C–1, ¶ 1.1.)[3] The contract further provided that Spectrum would be responsible for:

maintenance, policing, clearance/operations, and administration of Grand Bay Range in accordance with this PWS and applicable USAF, ACC, 9AF, and MAFB regulations, instructions, directives, and local operation procedures. The term *maintenance* applies to repair, refurbishment, and upkeep of real property and capital replacement as well as repair and upkeep of connecting roads, drainage ditches, swells, and culverts. *Policing* includes clearing all areas of general debris and foreign matter including Shiner Pond Road. The term *clearance/operations* specifically denotes those actions associated with actual fly-

ing operations (such as ordnance delivery), scoring functions, RCO duties, and flying safety enforcement. The term administration comprises recurring activities (such as record keeping, preparation and dispatch of correspondence/reports, maintaining logs/reports/instructions/directives, etc.). . . .

(*Id.* ¶ 1.1.4.)

Spectrum was required to provide a Range Control Officer (RCO) during flight operations. The RCO was to control "all Range operations with regard to the conduct of the aircraft as well as ground personnel in accordance with AFI 13–212, Vol. 2, paragraph 5.3, to ensure overall safety and flight management requirements are met (see Technical Exhibit 10)." (*Id.* ¶ 1.1.3.)[4]

The contract provided that Spectrum was to undertake the following daily operations: 1) open, close, and operate the Range in accordance with the Range operations checklist; 2) coordinate scoring functions; 3) record all radio communications with aircraft; 4) notify the Wing commander of Range limitations and restrictions; 5) notify range personnel of

---

3. The contract described the range as being: located adjacent to the east side of MAFB. It encompasses approximately 5,900 acres of land, for which the 347th Wing (347 WG), is host agency. The Range complex provides a bombing and gunnery facility for operational fighter training. (*Id.* ¶ 1.1.1.)

In a memorandum of understanding between the USAF, the Georgia Department of Natural Resources, and Spectrum, the range was described as "a tract of land, approximately 5900 acres, obtained from the U.S. Department of Interior for the operation of a *military aircraft bombing and gunnery* range." (Mem. of Understanding at 1). The memorandum also noted that the "range impact area is a relatively small portion (about 350 acres) near the center of the approxi-

mately 5900 acre tract, and is not open to public use at any time." (*Id.*)

4. Paragraph 5.3 of Volume II of the AFI 13–212 provides that the RCO will manage all range operations with regard to the control of both aircraft and ground personnel. The RCO communicates with the aircraft, controls aircraft traffic over the range, provides scores to the aircraft, and gives the aircraft weather and altimeter information. (AFI 13–212, Vol. II, ¶ 5.3.) The RCO supervises range operations to ensure that the range is available for aircraft to use. (*See, e.g., id.* ¶ 5.3.1 (providing that the RCO ensures the inspection of the range facilities and strafe impact areas scheduled for use prior to the opening of the range for operations).)

mission requirements that required unusual support services or safety precautions; and 6) report equipment maintenance discrepancies to the USAF. (*See id.*, Technical Ex. 10 ¶¶ 2.2.1–2.2.6.)

### 2. Specific Tasks

The contract lists no fewer than 53 "specific tasks" that Spectrum was to perform. (*See id.*, § C–5, ¶¶ 5.1.1.1–5.53.5.)[5] Among its specific tasks, Spectrum was required to maintain certain roads and control the flow of vehicle traffic on others. Specifically, it was to control vehicular traffic on the Range on Shiner Pond Road, and was responsible for locking the gates on that road. (*Id.* ¶ 5.7.)

Before the first mission of every day, Spectrum employees were to:

> physically verify ... that all entrances are secured and the Range is cleared of all personnel and equipment. Contractor shall double lock Dudley's Hammock gate and both gates adjacent to the west gate, during time when the Range is hot. The Range siren shall be activated prior to the first Range period of the day.... Prior to start of the first range period involving low-angle strafe, the contractor shall hand-police the strafe pits to be used. The contractor shall make a security check of all Range roads before the first flight of the day.

(*Id.* ¶ 5.6.)

Spectrum was required to maintain certain improved roads on the range. "They include[d] as a minimum: Shiner Pond Road within the Range boundary, Officer Loop Road, Spectrum Lane, Winnersville Lane, Falcon Lane, and Rivers Road." (*Id.* ¶ 5.42.) These roads were depicted on a map attached to the contract as Technical Exhibit 3. The map in Technical Exhibit 3b provided that Crash Trail Six is "Moody AFB maintained." (*Id.* at 80 (Technical Ex. 3b).)

In addition to maintaining the improved roads, the contract provided that Spectrum "shall install, maintain and repair security and/or safety gates and fences, as necessary, on the Range complex. This includes areas controlled by Fish and Game Division of the Georgia Department of Natural Resources." (*Id.* at ¶ 5.45.) The contract also provided that: "The Department of Natural Resources (DNR), Fish and Game Division, will maintain Range roads, fire breaks, and drainage systems on the south part of the Range. The following areas are DNR maintained ... All of crash trail number six." (*Id.* at ¶¶ 5.46–5.46.1.)

Crash Trail Six is only mentioned by name twice in the entire contract. It is listed as a road to be maintained by the DNR and is labeled "Moody AFB maintained" in Technical Exhibit 3b. In the first contract between Spectrum and the USAF, Crash Trail Six had been listed as one of the improved roads that Spectrum was responsible for. (*See* Contract (1987), § C–5 ¶ 5.4.3.2.1.) In the second and third contracts this provision was not included. (*See* Contract, § C–5 ¶ 5.42.) The contract

---

5. Many of the tasks delineated are administrative. (*See, e.g., id.* ¶¶ 5.1.1.1–5.1.1.16 (requiring Spectrum to, inter alia, compose correspondence, keep records, publications, and logs of events).) Other required tasks affected the functionality of the range. (*See, e.g., id.* ¶¶ 5.8–5.8.3 (requiring Spectrum to operate a simulated laser transmitter at the request of the USAF).) Still other tasks were safety related, e.g., fire prevention. (*See id.* ¶ 5.18.) The contract also covered such acts as target maintenance and construction, (*see id.* ¶¶ 5.31, 5.38), and procuring basic custodial supplies. (*See id.* ¶ 5.30.)

does not suggest why Spectrum's responsibility to maintain Crash Trail Six was not included in the subsequent contracts.

### 3. USAF Authority Over The Range

Spectrum did not exert ultimate authority over the range. "The control and responsibility and authority of the RCO does not assume the final authority and responsibilities of the aircraft commander or flight lead for aircraft operations except when operations repeatedly violate standard procedures or create a dangerous situation." (Id., Tech. Ex. 10 ¶ 1.1.) Spectrum was not allowed to approve changes to the daily schedule without coordination with the Wing Command Post. (Id. § C–1 ¶ 1.4.1.)

Spectrum could tell the USAF that Spectrum felt an event was unsafe, but it had no authority in the authorization process.[6] (Myrick Dep. (Jan. 26, 2000) at 70.) If the USAF told Spectrum an event was authorized, Spectrum accepted the USAF's determination. (Garrision Dep. (Oct. 7, 1999) at 31.)

Before the incident occurred Spectrum wrote to USAF Captain James Tidwell regarding the safety of Crash Trail Six. Captain Tidwell wrote Spectrum that he and Bob Puckett, the USAF's Range Operations Officer, had examined Crash Trail Six and that "no action should be taken to close this trail during range operations." (Letter from James Tidwell to Spectrum of 4/15/1992.) Tidwell noted that "Crash trail 6 is rarely used and there is approximately 3 miles of dense forest between the strafe impact area and this trail. This forest will

shield the occasional vehicle on crash trail 6 from strafe operations." (Id.)

The government had the right to inspect 100% of Spectrum's activities to assure quality. (Contract, Technical Ex. 1, ¶ 2.)

### B. Footprints

[A] footprint is a geometric shape that encompasses an area that is designed to contain at least 99.99% of all weapon impacts, plus its ricochet impacts for that weapon when it's delivered with certain velocities, dive angles, altitude, by particular aircraft, within a particular training environment, and it's designed to contain that at 95% confidence level.

(Myrick Dep. (Jan. 26, 2000) at 7.) The USAF uses a computer program, developed by Spectrum, to create footprints. The footprint shows a map of the range and its surrounds and an area where the weapon impacts would occur on the map. See Appendix (footprint of a strafe by a F–16 traveling at 215 degrees and firing PGU–27 rounds at strafe target two). These footprints are then used by the USAF to determine whether an event is authorized. (Garrison Dep. (Oct. 7, 1999) at 26.) Spectrum used the footprints to double check the USAF's authorization and to locate new targets. (Id. at 44.)

At some point prior to September 11, 1997, the USAF had begun to conduct 20mm strafing runs with a new bullet, the PGU–27. Prior to this, the USAF had used a 20mm round known as the M–55. Spectrum employees found PGU–27 fragments in the strafe pits before the incident. (Id. at 55.) Spectrum observed that

---

6. The USAF determined what ordnance could be delivered on the range and by what means it would be delivered through its authorization process.

USAF regulations required that there be enough government controlled or owned land to contain the hazard. (AFI 13–212, Vol. II ¶ 2.1.1.1.)

the rounds did not tend to ricochet, but instead broke apart on impact. Spectrum inferred from this that the PGU–27's footprint would be smaller than the M–55's. (*Id.*) Spectrum had asked the USAF about the flight characteristics of the new round.[7] The USAF told Spectrum that it had analyzed the round, and that it had determined that Spectrum should utilize the M–55 footprint for PGU–27 strafing. (*See* Myrick Dep. (Jan. 26, 2000) at 56.)

The USAF chose not to order a footprint for the PGU–27 prior to the incident. There was not a requirement that every range event have a footprint. (Garrison Dep. (Jan. 12, 2000) at 65, 43.) Spectrum therefore used the M–55 20mm low angle strafe footprint for the event that led to the incident.

Only after the incident did the USAF order a footprint for the PGU–27 event that had led to Plaintiff being injured. That footprint overlapped a portion of Crash Trail Six. (Myers Dep. at 49–50.) *See also* Appendix. Prior to September 11, 2000 and the creation of the PGU–27 footprint, there were no authorized events whose footprints fell across Crash Trail Six. (Garrison Dep. (Jan. 12, 2000) at 20; Myers Dep. at 32.)

### C. Plaintiff's Awareness Of Danger

Gullock was aware that the USAF conducted target practice on the range. (Gullock Dep. at 52–53.) He had heard bullets being fired on the range before. (*Id.* at 55.) Gullock had previously discussed with his co-worker the possibility of getting hit with stray rounds if he wandered onto the range, but not specifically regarding Crash

Trail 6. (*Id.* at 71–72.) He was aware of the possibility that rounds might land outside of the range. (*Id.* at 87.) The day of the incident, Gullock did not check to see if the range was being used for strafing that morning. (*Id.* at 72.)

## II. Discussion

### A. Motion To Strike

█ Spectrum has filed a motion to strike, seeking to have Plaintiffs' statement in opposition to Spectrum's statement of material facts not in dispute stricken because it was filed in an untimely fashion. Spectrum argues that because Plaintiffs did not file any statements required by Local Rule 56 when Plaintiffs filed their responsive briefs, Plaintiffs should be deemed to have admitted Spectrum's alleged facts not in dispute.

Plaintiffs filed their response to Spectrum's motion for summary judgment against Plaintiffs on February 22, 2000. Plaintiffs filed their Local Rule 56 statement on March 8, 2000.

Local Rule 56 provides:

The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue of material fact to be tried . . . .

All material facts set forth in the statement served by the moving party will be deemed admitted unless controverted by the statement required to be served upon the opposing party.

*Local R.* 56.

The Court finds that Spectrum was not prejudiced by Plaintiffs' arguably untimely

---

**7.** Spectrum did not have enough information at the time of the incident to have created a

footprint for the PGU–27. (*Id.* at 59.)

filing. Therefore the Court will not grant Spectrum's motion to strike.

### B. Summary Judgment

#### 1. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be entered in favor of the movant where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is (1) no genuine issue as to any material fact and that (2) the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir.1995).

The evidence and all reasonable factual inferences arising from it must be viewed in the light most favorable to the non-moving party. *See Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir.1992). The movant's entitlement to judgment as a matter of law is satisfied where "the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once a party has moved for summary judgment and properly supported its motion, the burden shifts to the nonmovant to create, through the evidentiary forms listed in Federal Rule of Civil Procedure 56(c), genuine issues of material fact necessitating a trial. *See id.* at 324, 106 S.Ct. 2548. "The evidence presented cannot consist of conclusory allegations or legal conclusions." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir.1991) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575,

20 L.Ed.2d 569 (1968)). The mere presence of an alleged factual dispute between the parties does not make summary judgment improper; a genuine issue of material fact must exist for a court to deny summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

#### 2. Strict Liability

■ Plaintiffs contend that as a matter of Georgia law Spectrum is strictly liable for the injuries that were caused by Gullock being struck by a 20mm shell. Defendants argue that Georgia law does not support a cause of action for strict liability in this case or if it does, that Gullock assumed the risk of being injured.

#### a. Abnormally Dangerous Activity

■ As the Court noted when ruling on Plaintiffs' motion to amend, this Court must apply Georgia law. "[W]hen considering a diversity case under state law, [the court] is bound to decide the case the way it appears the state's highest court would". *Towne Realty, Inc. v. Safeco Ins. Co. Of America*, 854 F.2d 1264, 1269 (11th Cir. 1988).

Both parties focus on a series of Georgia cases arising out of blasting operations to support their respective positions on strict liability. These blasting cases note that "[i]njuries to real property caused by concussion resulting from dynamite blasting are considered direct, and constitute a trespass to realty. One who voluntarily sets the force in motion is absolutely liable to the injured party despite the exercise of due care." *Berger v. Plantation Pipeline Company*, 121 Ga.App. 362, 173 S.E.2d 741, 742 (1970) (citing *Brooks v. Ready Mix Concrete Co.*, 94 Ga.App. 791, 96 S.E.2d 213 (1956) and *Ready–Mix Con-*

*crete Co. v. Rape,* 98 Ga.App. 503, 106 S.E.2d 429 (1958)). It is these blasting cases that have laid the foundation for Georgia's strict tort liability resulting from abnormally dangerous activities.

Plaintiffs analogize the facts before the Court to those in the blasting cases. Defendants suggest that those cases should be limited to blasting, and that their rule of law should not apply to personal injuries. The Court does not believe that these cases are directly on point. In *Brooks* and its progeny, the courts were confronted with a situation where the defendant was the party conducting the blasting operations. *See, e.g., Brooks,* 96 S.E.2d at 215. The language in these cases, although perhaps an overly broad assessment of the law, holds that liability will attach itself to those that "voluntarily [set] the force in motion." *Berger,* 173 S.E.2d at 742. In the case sub judice, the USAF set the force in motion. It was a USAF F–16 that fired the 20mm shell that hit Gullock in the chest. Spectrum's activities were generally limited to maintenance, supervision, administration, scoring, and policing. (Contract § C–1 ¶¶ 1.1, 1.1.4.) Spectrum did not set the force that injured Plaintiff in motion; its activities were not analogous to blasting.

The Court does not find Gullock's argument that strict liability in Georgia is limited to trespass against realty persuasive. As noted in the its order granting Plaintiffs leave to amend their complaint, strict liability in Georgia has been extended to

personal injury cases on at least one occasion. *See Ledbetter Brothers v. Jenkins,* 126 Ga.App. 413, 190 S.E.2d 797, 799 (1972).

Not surprisingly, there are no reported Georgia cases directly on point. Therefore the Court must attempt to decide the case the way it appears Georgia's highest court would. The most recent reported Georgia case applying strict liability to an abnormally dangerous activity has noted "[t]he significance of characterizing an activity as inherently dangerous is that strict liability is imposed on one who engages in an abnormally dangerous activity."[8] *Combustion Chemicals, Inc.,* 209 Ga.App. 240, 433 S.E.2d 60, 62 (1993) (quoting *C.W. Matthews Contracting Co. v. Wells,* 147 Ga. App. 457, 249 S.E.2d 281 (1978)).

Georgia courts have provided little guidance as to what constitutes an abnormally dangerous activity. "[T]he activity of holding highly acidic water in ponds which may pollute streams running through the property of adjoining landowners is not a dangerous activity" as a matter of law. *Combustion Chemicals,* 433 S.E.2d at 62. Neither is the "'piling of dirt on defendant's own property in carrying out a legitimate business activity.'" *Id.* (quoting *General Refractories Co. v. Rogers,* 240 Ga. 228, 239 S.E.2d 795, 798 (1977)).[9] Blasting "has always been considered, as a matter of law, an abnormally dangerous activity." *Id.* at 63. Thus blasting in Georgia is abnormally dangerous, but holding highly acidic water on one's property

---

**8.** Presumably the court equated the terms "inherently dangerous" and "abnormally dangerous."

**9.** The central issue in *General Refractories* was whether the defendant's actions constituted wilful misconduct, malice, fraud, wantonness, oppression, or an entire want of care that

would raise the presumption of a conscious indifference to consequences. *See General Refractories Co.,* 239 S.E.2d at 798. Strict liability for abnormally dangerous activities was not at issue but the court declared that such activity was "not abnormally dangerous." *Id.*

might not be. The Court is unable to find any other Georgia law on what constitutes an abnormally dangerous activity.

The Restatement (Second) of Torts § 520 establishes a six part test to determine whether an activity is abnormally dangerous. In the absence of any other state guidance, the Court finds that the Supreme Court of Georgia would apply the Restatement test to determine whether Spectrum's activities were abnormally dangerous.[10]

■ The Restatement (Second) of Torts provides that:

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520 (1977).

■ Spectrum operated the Grand Bay Range. Spectrum's duties consisted of maintenance, policing, and scoring.[11] Such duties do not have a high degree of risk. The Court takes judicial notice of the fact that similar maintenance operations occur throughout the country on a daily basis without incident. Spectrum's policing activities included clearing all areas on the range of general debris. (*See* Contract, § C-1 ¶ 1.1.4.) Policing and scoring are not activities that have high degrees of risks associated with them.

Although it is conceivable that someone might be injured during range maintenance, the likelihood of someone becoming gravely injured from mowing the lawn or a similar activity is low. They are also matters of common usage. More importantly, these risks are all eliminated with the exercise of reasonable care. Spectrum's activities are appropriate on a military installation such as Grand Bay Range. The range is used solely for this purpose. The Court does not consider Spectrum's activities dangerous,[12] and therefore finds that the risks from them are outweighed by their benefits.

Spectrum's activities were not abnormally dangerous. Spectrum did not cause Gullock's injury. Strict liability as a mat-

10. The Supreme Court of Georgia has routinely cited to Restatement of Torts for positive authority regarding other issues of law. *See, e.g., Gilbert v. Richardson,* 264 Ga. 744, 452 S.E.2d 476, 481 (1994)(citing *Restatement (Second) of Torts* § 895D); *International Paper Realty Co. v. Bethune,* 256 Ga. 54, 344 S.E.2d 228, 229 (1986) (citing *Restatement (Second) of Torts* §§ 368, 369).

11. This should be compared to the USAF's activities that lead to the incident. The USAF

fired 20mm shells at targets and it was that action that led to Gullock's injury.

Spectrum's president described Spectrum's activities as follows: "Most of our operations consist of sitting in the tower and ... controlling the aircraft, scoring the events". (Myrick Dep. at 73.)

12. This could be contrasted with the USAF's activities, but that issue is not before the Court.

ter of law is not applicable to Spectrum in this case.

### b. Assumption of Risk

■ The Court having found that strict liability is not applicable in this case, it will not address the issue of assumption of risk which in any event would be a question for a jury if Plaintiffs' strict liability claim were viable.[13]

### 3. Negligence

■ To state a cause of action for negligence in Georgia, the following elements are essential: (1) A legal duty to conform to a standard of conduct raised by law for the protection of others against reasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.

*Bradley Center, Inc. v. Wessner*, 250 Ga. 199, 296 S.E.2d 693, 695 (1982) (quoting *Lee Street Auto Sales, Inc. v. Warren*, 102 Ga.App. 345, 116 S.E.2d 243, 245 (1960)).

■ A party's legal duty may arise by operation of law or by contract. *See National Foundation Co. v. Post, Buckley, Schuh & Jernigan, Inc.*, 219 Ga.App. 431, 465 S.E.2d 726, 729 (1995) (citing *Armor Elevator Co. v. Hinton*, 213 Ga.App. 27, 443 S.E.2d 670, 672 (1994)). Determining what duty a defendant owed a plaintiff is a matter of legal policy, and therefore, a matter of law. *Id.* (citing *Meinken v. Piedmont Hosp., Inc.*, 216 Ga.App. 252, 454 S.E.2d 147, 148 (1995)).

Plaintiffs identify numerous duties that Spectrum arguably breached: 1) a duty to install gates on Crash Trail Six; 2) a duty to verify that all entrances to the range were secured; 3) a duty to ensure safety on Crash Trail Six; 4) a duty to ensure range safety during flight operations and to comply with AFI 13–212.

### a. Duty To Install And Maintain Gates On Crash Trail Six

■ Plaintiffs suggest that Spectrum owed a duty to install gates on Crash Trail Six, and that as a result of its failure to do so, Gullock suffered harm. Plaintiffs argue that Spectrum's duty to install gates on Crash Trail Six arises out of its con-

---

**13.** To establish an assumption of the risk defense a defendant must show that plaintiff: (1) had knowledge of the danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed himself to those risks.... The knowledge requirement does not refer to a comprehension of general, non-specific risks. Rather, the knowledge that a plaintiff who assumes the risk must subjectively possess is that of the specific, particular risk of harm associated with the activity or condition that proximately causes injury. *Bodymasters Sports Indus. v. Wimberley*, 232 Ga.App. 170, 501 S.E.2d 556, 561 (1998). Gullock had discussed the possibility of being hit by stray rounds. (Gullock Dep. at 71–

72.) However, this discussion appears to have only dealt with gated areas on the range. (*Id.*) Although Gullock stated that he knew a ricochet could land anywhere on the base or range, the Court does not find that this meant Gullock appreciated the risk involved with traveling on Crash Trail Six. This interpretation might mean that almost all personnel at the range and base assumed the risk of being hit. Gullock claims that there were no signs warning of danger. (*Id.* at 73.) (*Compare* Myers Dep. at 61.) The Court finds that whether Gullock had knowledge of risks specific to traveling Crash Trail Six would be a question for the jury. As strict liability is not a viable claim in this case, the point is moot.

tract with the USAF. Plaintiffs cite to section C–5, ¶¶ 5.45–5.46.1 for support.

As noted supra, these paragraphs provided:

5.45. **GATES AND FENCES.** The contractor shall install, maintain and repair security and/or safety gates and fences, *as necessary* on the Range complex. This includes areas controlled by Fish and Game Division of the Georgia Department of Natural Resources.

5.46. **FISH AND GAME DIVISION'S RESPONSIBILITIES.** The Department of Natural Resources (DNR), Fish and Game Division, will maintain Range roads, fire breaks, and drainage systems on the south part of the Range. The following areas are DNR maintained (See Technical Exhibit C–1).

5.46.1. All of crash trail number six.

(Contract, § C–5, ¶¶ 5.45—5.46.1 (italics added).) Technical Exhibit 3b (part of Technical Exhibit C–1) is a map displaying that Crash Trail Six is "Moody AFB maintained." (*Id.* at 81.)

The Contract provides that the contractor shall install and maintain gates as necessary. (*Id.*, § C–5, ¶ 5.45.) As noted supra, the bullet that struck Plaintiff was of a type known as the PGU–27. On September 11, 1997, Spectrum did not have a footprint for the PGU–27 round. (Myrick Dep. (Jan. 26, 2000) at 59.) Spectrum had a footprint for the M–55 round, and this footprint did not cover any portion of Crash Trail Six. (Myers Dep. at 32; Garrison Dep. (Jan. 12, 2000) at 20.) Spectrum's observations indicated that the PGU–27 would ricochet less than the M–55, thereby decreasing the size of PGU–27

footprint relative to the M–55 footprint. (Myrick Dep. (Jan. 26, 2000) at 55.) Spectrum did not have enough information to create a new footprint for the PGU–27. (*Id.* at 59.) The USAF had more information about the PGU–27 than Spectrum, and told Spectrum that Spectrum should utilize the M–55 footprint for PGU–27 strafing events. (*Id.* at 56.) Plaintiff has been unable to show any authorized events that covered Crash Trail Six.

As there were no footprints of authorized events covering Crash Trail Six, Crash Trail Six was not dangerous to travel on.[14] The USAF had made the same determination: "there is approximately 3 miles of dense forest between the strafe impact area and this trail. This forest will shield the occasional vehicle on crash trail 6 from strafe operations." (Letter from James Tidwell to Spectrum of 4/15/1992.) Spectrum's contractual duty was to erect fences only as necessary. Such a necessity could have only presented itself to Spectrum after two events: 1) the knowledge of bullets reaching or having the ability to reach Crash Trail Six; or 2) the creation of a footprint for the PGU–27. The bullet striking Gullock in the chest achieved the first event; Spectrum did not have this knowledge until Gullock was injured. The creation of a PGU–27 footprint did not and could not have occurred until after Gullock was injured. Therefore, it was not necessary for Spectrum to install gates barring access to Crash Trail Six before September 11, 1997.[15]

#### b. Duty To Verify Security Of All Range Entrances

 Plaintiffs argue that the contract required Spectrum to verify that all en-

14. It is not clear whether Spectrum could have installed gates, had it thought them necessary. Captain Tidwell, had told Spectrum that "no action should be taken to close this

trail during range operations." (Letter from James Tidwell to Spectrum of 4/15/1992.)

15. Plaintiffs orally argued that if Spectrum did not have a duty under the third contract

trances to the range were secure on September 11, 1997, and that Spectrum breached that duty. The relevant portion of the contract provided:

> 5.6. **BEFORE FIRST MISSION OF DAY.** Contractor personnel shall physically verify, prior to the first mission of each day, that all entrances are secured and the Range is cleared of all personnel and equipment. Contractor shall double lock Dudley's Hammock gate and both gates adjacent to the west gate, during time when the Range is hot.... The contractor shall make a security check of all Range roads before the first flight of the day.

(Contract, § C–5, ¶ 5.6.)

The Court must determine whether, on the morning of September 11, 1997, Spectrum verified that all of the range entrances were secured.[16] To conduct this inquiry, the Court must determine what were the range entrances. The contract does not explicitly list the range entrances.

It is conceivable that if Crash Trail Six were part of the range, then a portion of it might be a range entrance. Defendant has argued that Crash Trail Six is not part of the range, nor did Spectrum have any obligation regarding it under the contract. Plaintiffs argue the opposite. As Spectrum's duty is a product of the contract, whether Crash Trail Six was a part of the range is only important to the extent it informs the Court's construction of the contract.

Plaintiffs cite to paragraphs 5.46 and 5.46.1 of the contract to show that Crash Trail Six is a range road. Plaintiffs also cite to a Technical Exhibit 3b for support. Plaintiffs further cite to a statement made by Glenn Myers declaring his belief that Crash Trail Six was part of the range. Plaintiffs also cite to a Hazard computer program printout that depicts the western boundary of the range to the west of Crash Trail Six.

 The Court must determine if paragraph 5.6 created a duty on the part of Spectrum to physically verify that Crash Trail Six was secure. The construction of a contract is a question of law for the court. *Georgia Code Ann.* § 13–2–1; *Georgia Ass'n of Educators, Inc. v. Paragon Productions, Inc.*, 238 Ga.App. 681, 520 S.E.2d 37, 39 (1999). The cardinal rule of contract construction is to ascertain the intention of the parties. *Thornton v. Kumar*, 240 Ga.App. 897, 525 S.E.2d 735, 736 (1999) (citing *Ga.Code Ann.* § 13–2–3). If the contract is ambiguous in some respect, the Court must apply the rules of contract construction to resolve the ambiguity. *Id.* (citing *Century 21 Pinetree Properties v. Cason*, 220 Ga.App. 355, 469 S.E.2d 458, 462 (1996)). "[I]f the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury." *Kumar* at 736.

The ambiguity in the contract arises from the fact that it is unclear from the

---

with the USAF, then such a duty existed under the first contract. The first contract, like the third contract, required Spectrum to erect gates and fences only "as necessary." (Contract (1987) § C–5 ¶ 5.4.3.2.1.3.) Therefore, for the same reasons that Spectrum was not obligated to erect fences on Crash Trail Six under the third contract, it was not obligated to do so under the first contract.

**16.** Plaintiffs do not suggest that Gullock was on the range before the first mission of the day, but appear to argue that Gullock was able to enter Crash Trail Six because it was not secured.

contract as to whether Crash Trail Six is part of the range and paragraph 5.6 does not explicitly refer to Crash Trail Six. Crash Trail Six is only referenced twice in the contract. The first is in paragraph 5.46.1. The second is in technical exhibit 3b on the map purported to be a range road map.

Paragraphs 5.46 and 5.46.1 provided: "The Department of Natural Resources (DNR), Fish and Game Division, will maintain Range roads, fire breaks, and drainage systems on the south part of the Range. The following areas are DNR maintained ... All of crash trail number six." (Contract § C–5 ¶¶ 5.46–5.46.1.) The range road map provided that Crash Trail Six is "Moody AFB maintained." (*Id.* at 80.) These are the only references in the contract to Crash Trail Six. Nowhere in the contract does it state that Crash Trail Six is a part of the range or that Spectrum has a duty related to Crash Trail Six. Both times Crash Trail Six is referenced, some party other than Spectrum owes the related duty. The contract did not explicitly provide that Spectrum had an obligation to check Crash Trail Six every morning. However, the fact that Crash Trail Six is mentioned in the contract, a document devoted to the Grand Bay Range, might suggest that Crash Trail Six is part of the range.

As noted *supra*, the cardinal rule of contract construction is to ascertain the intention of the parties. *Thornton*, 525 S.E.2d at 736. The Court notes that paragraph 5.6 does not explicitly require that Spectrum verify the security of Crash Trail Six. Although the contract references Crash Trail Six twice, nowhere in the contract does the contract explicitly assign any obligation to Spectrum regarding Crash Trail Six.

In 1992, prior to the creation of the contract from which Spectrum's relevant obligations devolved, a dialogue occurred between the USAF and Spectrum regarding Crash Trail Six. The USAF informed Spectrum that "no action should be taken to close [Crash Trail Six] during range operations." (Letter from James Tidwell to Spectrum of 4/15/1992.) Additionally, the USAF told Spectrum that "Crash trail 6 is rarely used and there is approximately 3 miles of dense forest between the strafe impact area and this trail. This forest will shield the occasional vehicle on crash trail 6 from strafe operations." (*Id.*)

This letter suggests that the USAF knew vehicles might be on Crash Trail Six during strafing runs. The Court finds that this letter was instructive regarding the contracting parties' intentions as they pertained to paragraph 5.6 and Crash Trail Six.[17] Paragraph 5.6 was not intended to apply to Crash Trail Six, and it was *not* one of Spectrum's obligations to clear vehicles from Crash Trail Six during strafing operations.

### c. Duty To Ensure Safety On Crash Trail Six

■■■ Plaintiffs argue that Spectrum had a duty to ensure that bombs and bullets did not fall off of the range and onto Crash Trail Six. Plaintiffs argue that Spectrum knew that Crash Trail Six was hazardous during flight operations and that

---

**17.** This letter predates both the second and third contracts between Spectrum and the USAF. The reference to Crash Trail Six as an improved road in the first contract was re-moved in the second and third contracts, further suggesting that Spectrum would have no obligations regarding it.

Spectrum's range manager knew that certain weapons footprints fall on Crash Trail Six.

Plaintiffs claim that Spectrum knew Crash Trail Six was hazardous during flight operations is a misstatement. Spectrum's Range Manager Elmer Myers stated "when the range is 'hot,' i.e. being used for strafing or bombing, travel on Crash Trail Six is hazardous. A footprint for 20 mm low angle strafe, based on the M–55 round and centered on target four, crosses over a portion of the trail." (USAF Accident Investigation Sum. of Myers' Statement (Oct. 14, 1997) at 1.)

The statement, although perhaps true considering Plaintiff John Gullock's injury, does not reflect Spectrum's knowledge on September 11, 1997.[18] Although it appears to be true that the footprint of a low angle strafe centered on target four might overlap Crash Trail Six, 20 mm rounds were never fired at target four. (Myers Dep. at 31.) Therefore this does not prove that Spectrum had knowledge that footprints of authorized events fell on Crash Trail Six.[19] In fact, on September 11, 1997, there were no authorized events with footprints that covered Crash Trail Six. (Garrison Dep. (Jan. 12, 2000) at 20; Myers Dep. at 32.)

Spectrum did not know that the footprint for the PGU–27 was different than that of the M–55. *See supra* at 1371–72. As long as Spectrum was unaware that there were any differences in the footprints of the PGU–27 and the M–55 and that it was unaware that there were approved footprints that fell over Crash Trail Six, Spectrum as a matter of law did not breach its duty to keep Crash Trail Six safe.

#### d. Duty To Ensure Range Safety

█ Plaintiffs contend that Spectrum breached its duty to keep the range safe. Plaintiffs argue that this duty arises from AFI 13–212, providing that the Range Control Officer, a Spectrum employee, is responsible for "all range operations with regard to both aircraft and ground personnel and is responsible for air and ground safety." (AFI 13–212 ¶ 2.3.1 at 14.) Plaintiffs argue that the duty also arises from paragraph 5.45 of the contract between Spectrum and the USAF.

With regard to AFI 13–212 the Court notes that the Defendant did not breach its duty as set out in paragraph 2.3.1 of AFI 13–212. Spectrum had no knowledge and no reason to suspect that the PGU–27 could reach Crash Trail Six. Spectrum was told by the USAF to treat the PGU–27 as it would the M–55 round. Spectrum was told by the USAF not to take any action regarding Crash Trail Six. Therefore Spectrum could not have and should not have taken any actions in addition to those it had already taken regarding the safety of Crash Trail Six. Spectrum did not breach its duty under AFI 13–212.

#### 4. Premises Liability

Spectrum suggests that it cannot be held liable for Gullock's injuries because of the Georgia premises liability statute. Plaintiffs argue that their claim is in negligence and that premises liability is not relevant to this action. Without addressing the matter in detail, the Court notes that, as a matter of law, Plaintiffs cannot recover under their two primary causes of

---

18. Myers claims that his statement as to whether Crash Trail Six was dangerous or not was based on the fact that Gullock was injured there. (Myers Dep. at 20.)

19. The mere existence of a footprint does not mean that it was approved. (*See* Myers Dep. at 31.)

action: negligence and strict liability. Therefore, Spectrum's premise liability defense is moot.

### 5. Loss of Consortium

 Plaintiff Sandi Gullock has brought a claim for loss of consortium against Spectrum. This claim was not briefed by the parties. The Court will rule, *sua sponte,* on this claim because "[o]ne spouse's right of action for the loss of the other's society or consortium is a derivative one, stemming from the right of the other." *Douberly v. Okefenokee Rural Electric Membership Corp.,* 146 Ga.App. 568, 246 S.E.2d 708, 709 (1978) (quoting *Hightower v. Landrum,* 109 Ga.App. 510, 136 S.E.2d 425, 428 (1964)). *See also Henderson v. Hercules, Inc.,* 253 Ga. 685, 324 S.E.2d 453, 454 (1985) (citing positively to *Douberly* ). Plaintiff John Gullock's claims of negligence and strict liability cannot succeed as matters of law, and therefore his wife's loss of consortium claim cannot succeed as a matter of law.

### 6. Third–Party United States' Motion For Summary Judgment

Spectrum has brought a claim against the United States seeking compensation in the event that Spectrum is found liable. The Court has found that Spectrum cannot be found liable as a matter of law. Therefore Spectrum's Claim against the United States is moot.

### III. Conclusion

The Court **HEREBY DENIES** Plaintiffs' motion for summary judgment against Spectrum, the United States' motion for summary judgment against Spectrum, and Spectrum's motion to strike. The Court **HEREBY GRANTS** Spectrum's motion for summary judgment against Plaintiffs.

**1382**

# Appendix

The shaded area is the footprint.
(Shading added by the Court.)

Spectrum 01867