S94G0620. BANKS et al. v. ICI AMERICAS, INC.
(450 SE2d 671)

HUNSTEIN, Justice.

The parents and administrator of the estate of Marlo Strum brought suit against a local boy's club, a pest control company, and ICI Americas, Inc., the manufacturer of a rodenticide called "Talon-G," alleging that nine-year-old Marlo died after ingesting an unknown amount of Talon-G, which he had found in a cabinet in an unmarked container at the boy's club serviced by the pest control company. As to ICI, plaintiffs alleged under both negligence and strict liability the-

ories that Talon-G was defectively designed and that the product had been inadequately labelled. The case proceeded to trial, during which the boy's club and pest control company settled with plaintiffs. The jury found against ICI and awarded plaintiffs, in addition to compensatory damages (set off against amounts received from the other defendants), punitive damages in the amount of $1 million. The Court of Appeals reversed the judgment on the bases that the evidence was not sufficient to support a finding that Talon-G was defectively or negligently designed and that plaintiffs' failure to warn claim was preempted by Federal law. *ICI Americas v. Banks,* 211 Ga. App. 523 (440 SE2d 38) (1993). Writ of certiorari was granted to consider the Court of Appeals' opinion.

1. There are three general categories of product defects: manufacturing defects, design defects, and marketing/packaging defects. See Maleski, Ga. Products Liability (2d ed.), § 5-1. In the seminal case in Georgia, *Center Chemical Co. v. Parzini,* 234 Ga. 868 (218 SE2d 580) (1975), this Court held that OCGA § 51-1-11 imposes strict liability for defective products and concluded that a product that is "properly prepared, manufactured, packaged and accompanied with adequate warnings and instructions . . . can not be said to be defective." Id. at 870 (4). *Parzini* addressed manufacturing and packaging defects and did not recognize the existence of design defects,[1] i.e., those cases where it is not possible to ascertain whether a product is "defective" by simply comparing it to a properly manufactured item from the same product line. See Maleski, supra at § 6-1. This Court nevertheless followed *Parzini* when directly presented with a defective design claim in *Mann v. Coast Catamaran Corp.,* 254 Ga. 201 (326 SE2d 436) (1985). In *Mann,* the Court rejected evidence of alternative safer designs to hold that where a product was "reasonably suited for its intended purpose" and where the presence or absence of a design feature did not prevent the product "from functioning properly in its intended use, such cannot be considered defective design." Id. at 202 (1).

The Court in *Mann* failed to recognize that the *Parzini* manufacturing defect analysis was not applicable to a design defect case. Unlike a manufacturing defect case, wherein it is assumed that the design of the product is safe and had the product been manufactured in accordance with the design it would have been safe for consumer use, in a design defect case the entire product line may be called into

---

[1] Although the plaintiff argued that the drain cleaner that injured him was defective because it was composed of nearly 100 percent sulfuric acid, the Court did not address the design issue and instead focused exclusively on "the question . . . whether the product was defective in its manufacture, its packaging, or the failure to adequately warn of its dangerous propensities." Id. at 871.

question and there is typically no readily ascertainable external measure of defectiveness. It is only in design defect cases that the court is called upon to supply the standard for defectiveness: the term "defect" in design defect cases is an expression of the legal conclusion to be reached, rather than a test for reaching that conclusion. Wade, On Product Design Defects and Their Actionability, 33 Vand. L. Rev. 551, 552 (1980); 2 American Law of Products Liability 3d (1987), § 28:1.

Because neither *Parzini* nor *Mann* addresses the appropriate test for reaching the legal conclusion that a product's design specifications were partly or totally defective, we hold that the analysis therein will henceforth not be utilized in products liability design defect cases.[2]

To arrive at the appropriate test for reaching the legal conclusion that a product's design specifications were partly or totally defective, this Court has conducted an exhaustive review of foreign jurisdictions and learned treatises. That review has revealed a general consensus regarding the utilization in design defect cases of a balancing test whereby the risks inherent in a product design are weighed against the utility or benefit derived from the product. See, e.g., 1 Am. L. Prod. Liab., § 1:49; Preliminary Draft No. 1 (April 20, 1993) Restatement (Third) of Torts: Products Liability, § 101, Reporters' Notes to Comment G; O'Reilly & Cody, The Products Liability Resource Manual (General Practice Section of the American Bar Association 1993) § 6.04, p. 66. This risk-utility analysis incorporates the concept of "reasonableness," i.e., whether the manufacturer acted reasonably in choosing a particular product design, given the probability and seriousness of the risk posed by the design, the usefulness of the product in that condition, and the burden on the manufacturer to take the necessary steps to eliminate the risk.

> When a jury decides that the risk of harm outweighs the utility of a particular design (that the product is not as safe as it should be), it is saying that in choosing the particular design and cost trade-offs, the manufacturer exposed the consumer to greater risk of danger than he should have. Conceptually and analytically, this approach bespeaks negligence.

Birnbaum, Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence, 33 Vand. L. Rev. 593,

---

[2] The analysis in *Parzini* will continue to apply to inadvertent design errors, which, as distinguished from conscious design choices, are treated in the same way as manufacturing defects "not because they are both unintended, but because they are both subject to measurement against a built-in *objective* standard or norm of proper manufacture or design." *Bowman v. General Motors Corp.*, 427 FSupp. 234, 241 (ED Pa. 1977).

610 (1980).

The balancing test that forms the risk-utility analysis is thus consistent with Georgia law, which has long applied negligence principles in making the determination whether a product was defectively designed.[3] Accord *Hunt v. Harley-Davidson Motor Co.*, 147 Ga. App. 44 (4) (248 SE2d 15) (1978), in which it was noted that "[a]lthough the benefits of safer products are certainly desirable, there is a point at which they are *outweighed* by the cost of attaining them." (Emphasis supplied.) See also Maleski, supra at §§ 5-5 and 6-2. Therefore, because the risk-utility analysis is consistent with Georgia law and represents the overwhelming consensus among courts deciding design defect cases, 1 Am. L. Prod. Liab., supra at § 1:50, we conclude that the better approach is to evaluate design defectiveness under a test balancing the risks inherent in a product design against the utility of the product so designed. Hence, we hereby adopt the risk-utility analysis.

Numerous lists of factors to be considered by the trier of fact in balancing the risk of the product against the utility or benefit derived from the product have been compiled by various authorities. One factor consistently recognized as integral to the assessment of the utility of a design is the availability of alternative designs, in that the existence and feasibility of a safer and equally efficacious design diminishes the justification for using a challenged design. *O'Brien v. Muskin Corp.*, 463 A2d 298, 305 (N.J. 1983). See 78 ALR4th 154. The alternative safer design factor reflects the reality that

[i]t often is not possible to determine whether a safer design would have averted a particular injury without considering

---

[3] As noted in the Court of Appeals' opinion, " 'only semantics distinguishes the cause of action for negligence and a cause of action pursuant to OCGA § 51-1-11 (claiming strict liability for defective design).' [Cit.]" *ICI Americas*, supra at 524. See also *Mann*, supra at (2), in which this Court held that the "claims of negligence . . . are but re-statements of the claims relative to defective design."

While we recognize that the determination of whether a product was defective (involving the reasonableness of a manufacturer's design decisions), which is a basic inquiry for strict liability purposes, generally will overlap the determination of whether the manufacturer's conduct was reasonable, which is a basic inquiry for negligence purposes, we cannot agree that the use of negligence principles to determine whether the design of a product was "defective" necessarily obliterates under every conceivable factual scenario the distinction Georgia law has long recognized between negligence and strict liability theories of liability. See *Ford Motor Co. v. Carter*, 239 Ga. 657, 659-662, esp. fn 3 (238 SE2d 361) (1977); *Ford Motor Co. v. Stubblefield*, 171 Ga. App. 331, 334 (2) and fn. 1 therein (319 SE2d 470) (1984). See also OCGA § 51-1-11 (b) (2) and (c) (creating exceptions to statute of repose in negligence claims not applicable to strict liability claims). Hence, we see no reason to conclude definitively that the two theories merge in design defect cases. Compare *Prentis v. Yale Mfg. Co.*, 365 NW2d 176 (Mich. 1984); *Jones v. Hutchinson Mfg.*, 502 SW2d 66 (Ky. 1973). See also Henderson & Twerski, A Proposed Revision of Section 402A of the Restatement (Second) of Torts; 77 Cornell L. Rev. 1512, 1531-1532 (1992).

> whether an alternative design was feasible. The essential inquiry, therefore, is whether the design chosen was a reasonable one from among the feasible choices of which the manufacturer was aware or should have been aware.

2 Am. L. Prod. Liab., supra at § 28:14, p. 28. Indeed, the reasonableness of choosing from among various alternative product designs and adopting the safest one if it is feasible is considered the "heart" of design defect cases,[4] 78 ALR4th 154, § 2, since it is only at their most extreme that design defect cases reflect the position that a product is simply so dangerous that it should not have been made available at all. See *O'Brien*, supra, 463 A2d at 306; Prosser and Keeton, The Law of Torts (5th ed.) § 96, pp. 688-689.

We agree with the importance placed on the alternative safer design factor and now hold that in determining whether a product was defectively designed, the trier of fact may consider evidence establishing that at the time the product was manufactured, an alternative design would have made the product safer than the original design and was a marketable reality and technologically feasible.[5] *Rix v. General Motors Corp.*, 723 P2d 195, 202 (II) (Mont. 1986). Anything to the contrary in *Mann* is disapproved.

We recognize that in setting forth a test under the risk-utility analysis for the determination whether a manufacturer should be liable for an entire product line, no finite set of factors can be considered comprehensive or applicable under every factual circumstance, since such matters must necessarily vary according to the unique facts of each case. Such diverse matters as competing cost trade-offs, tactical market decisions, product development and research/testing demands, the idiosyncrasies of individual corporate management styles, and federal and other regulatory restrictions can enter into a consideration of the reasonableness of a manufacturer's decision-making process. However, for the benefit of bench and bar, we have set forth in the accompanying footnote a non-exhaustive list of general factors derived from numerous sources.[6]

---

[4] In the preliminary draft for the Restatement (Third) of Torts: Products Liability, § 101, comment g, "[l]iability for defective design attaches *only* when the plaintiff proves that the seller . . . failed to adopt a reasonable, safer design that would have reduced the foreseeable risks of harm presented by the product." (Emphasis supplied.)

[5] "It is important to distinguish evidence of what safety features were *feasible* at the time a product was designed, from evidence of what safety features were *known to be desirable* at that time." *Habecker v. Clark Equip. Co.*, 942 F2d 210, 215 (3rd Cir. 1991). As to feasibility, see Prosser and Keeton, supra at § 96, p. 700.

[6] These factors include: the usefulness of the product; the gravity and severity of the danger posed by the design; the likelihood of that danger; the avoidability of the danger, i.e., the user's knowledge of the product, publicity surrounding the danger, or the efficacy of warnings, as well as common knowledge and the expectation of danger; the user's ability to

We reaffirm that under Georgia law a manufacturer is not an insurer that its product is, from a design viewpoint, incapable of producing injury. *Greenway v. Peabody Intl. Corp.*, 163 Ga. App. 698 (1) (294 SE2d 541) (1982); *Hunt*, supra at (4). However, we can no longer accept the position that a manufacturer cannot be liable for injuries proximately caused by a product that functions for its intended use, regardless of the risks associated with the product and its utility to the public or the plaintiff's ability to adduce evidence that a feasible alternative design, which could have prevented or minimized the plaintiff's injury, was available at the time the manufacturer made its design, manufacturing, and marketing decisions.

2. Because the Court of Appeals based its holding on *Parzini* and *Mann*, its judgment is reversed. Likewise, a review of the record reveals that the evidence, the parties' objections thereto, and the arguments made during trial, as well as certain rulings of the trial court and the instructions given to the jury regarding its consideration of the evidence, were governed in reliance upon holdings of this Court using a legal analysis we now determine to be inapplicable to design defect claims. Hence, plaintiffs are entitled to a new trial on their claim that ICI's rodenticide was defectively designed, consistent with the appropriate test for design defect claims set forth in this opinion. Therefore, the case is remanded to the Court of Appeals with direction that a new trial be granted unless a new trial is precluded by the Court of Appeals' resolution of the remaining enumerations of error.

3. We affirm the holding in Division 2 of the Court of Appeals' opinion that the Federal Insecticide, Fungicide and Rodenticide Act, 7 USC § 136-136y, preempts plaintiffs' claim that ICI inadequately or inaccurately labelled the Talon-G it sold to the pest control operator.

---

avoid danger; the state of the art at the time the product is manufactured; the ability to eliminate danger without impairing the usefulness of the product or making it too expensive; and the feasibility of spreading the loss in the setting of the product's price or by purchasing insurance. We note that a manufacturer's proof of compliance with industry-wide practices, state of the art, or federal regulations does not eliminate conclusively its liability for its design of allegedly defective products. See *Elliott v. Brunswick Corp.*, 903 F2d 1505, 1508 (11th Cir. 1990); *O'Brien*, supra, 463 A2d at 305.

Alternative safe design factors include: the feasibility of an alternative design; the availability of an effective substitute for the product which meets the same need but is safer; the financial cost of the improved design; and the adverse effects from the alternative.

In regard to the benefits aspect of the balancing test, factors that could be considered include the appearance and aesthetic attractiveness of the product; its utility for multiple uses; the convenience and extent of its use, especially in light of the period of time it could be used without harm resulting from the product; and the collateral safety of a feature other than the one that harmed the plaintiff. See O'Reilly & Cody, The Products Liability Resource Manual, supra at § 6.05.

This list has been culled from such sources as Maleski, supra at § 5-3; 2 Am. L. Prod. Liab., supra at §§ 28:11-28:21; *Barker v. Lull Engineering Co.*, 573 P2d 443, 455 (Cal. 1978); and *Bowman*, supra, 427 FSupp. at 244-245, fn. 18 (listing factors proposed by Professors Wade and Fisher).

*Papas v. Upjohn Co.*, 985 F2d 516 (11th Cir. 1993).

*Judgment affirmed in part, reversed in part and remanded with direction to the Court of Appeals. All the Justices concur, except Hunt, C. J., and Fletcher, J., who concur specially and dissent in part and Carley, J., who concurs in part and dissents in part.*

FLETCHER, Justice, concurring in part and dissenting in part.

I concur in Division 3 and I concur that a risk-utility analysis is appropriate in a design defect case. I cannot fully agree, however, with the majority's formulation of the standard to be applied.

I write to emphasize that an essential element of a plaintiff's cause of action is proof that the "seller . . . failed to adopt a reasonable, safer design that would have reduced the foreseeable risks of harm presented by the product." See Preliminary Draft No. 1 (April 20, 1993) Restatement (Third) of Torts: Products Liability, § 101, comment g (cited at footnote 4 of the majority opinion). Requiring the plaintiff to prove that, at the time of manufacture of the product, an alternative safer design existed is consistent with the majority of jurisdictions that have adopted this analysis. See O'Reilly & Cody, The Products Liability Resource Manual, § 6.06 at 67 (General Practice Section of the American Bar Association 1993) ("the great majority of case precedents require that the plaintiff prove the existence of an alternative design"). Furthermore, by suggesting that a safer feasible alternative is a mere factor to be considered, rather than an essential element, the majority endorses a standard that is inconsistent with the reality that although "[m]any products can not be made completely safe for use and some can not be made safe at all . . . such products may be useful and desirable." *Center Chemical Co. v. Parzini*, 234 Ga. 868, 870 (218 SE2d 580) (1975).

I also write to emphasize that a manufacturer may be held liable only when the product's "condition when sold is the proximate cause of the injury sustained." OCGA § 51-1-11 (b) (1). In order to demonstrate proximate cause, proof that the alternative design provides a "materially significant increase in safety" that would have prevented or reduced the plaintiff's injury is required, rather than evidence that the alternative design merely "could have" prevented the injury, as the majority suggests. See Restatement, supra, comment g.

I dissent to Division 2, because I agree with Justice Carley that remand for a new trial is not appropriate. The record below and the briefs before this Court demonstrate that the plaintiffs' theory of liability at trial was that the rat poison was defective because a safer alternative was feasible. ICI defended on the basis that at the time of manufacture no safer alternative was feasible. Thus, the parties have already presented their best case under the standard that the Court now adopts. To require the parties to redo what they have already

done is simply a waste of resources. Either this Court or the Court of Appeals should review the evidence to determine whether, in light of the new rule, the evidence is sufficient to uphold the jury's verdict. If the evidence is sufficient to uphold the jury's verdict, the Court of Appeals should then consider ICI's remaining enumerations of error, which it did not address previously.

I am authorized to state that Chief Justice Hunt joins in this opinion.

CARLEY, Justice, concurring in part and dissenting in part.

I fully concur in Divisions 1 and 3 of the majority opinion, but cannot concur in Division 2. I agree with adoption of the risk-utility analysis for design defect claims and with the disapproval of the analysis in *Mann v. Coast Catamaran Corp.*, 254 Ga. 201 (326 SE2d 436) (1985). However, the Court of Appeals correctly applied the law as it existed at the time of its decision. Now that the rule has been changed on certiorari, I would remand this case to the Court of Appeals to allow it to apply the new rule to the record and to enable the parties properly to address the record in light of the new rule. At such time, the Court of Appeals would also need to consider ICI's remaining enumerations of error, which it did not address in its original opinion. Accordingly, I respectfully concur in part and dissent in part.

DECIDED DECEMBER 5 1994 —
RECONSIDERATION DENIED DECEMBER 20, 1994.

*Robert E. Shields, Richard A. Childs,* for appellants.
*Susan D. Burnell, Phillip S. McKinney, M. Stephen Hyles,* for appellee.
*Elizabeth B. Bunce, Charles A. Mathis, Walter H. Beckham III,* amici curiae.