[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-10786

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 11, 2011
JOHN LEY
CLERK

D. C. Docket No. 1:08-cv-2078-TCB

MELANIE P. IVY,

                                                          Plaintiff-Appellant,

versus

FORD MOTOR COMPANY,

                                                          Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(July 11, 2011)

Before CARNES, ANDERSON and FARRIS,* Circuit Judges.

ANDERSON, Circuit Judge:

I. Background

_____

* Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

The background facts were set out concisely in the district court's opinion:

Plaintiff Melanie Ivy is a woman in her mid-twenties who was injured in a single-car accident when driving a vehicle manufactured by Defendant Ford Motor Company.

On May 22, 2006, when Ivy was twenty-four years old, she was traveling on Holcomb Bridge Road in Gwinnett County, Georgia in her mother's 1996 Ford Explorer. She was initially in the right lane and then moved into the left lane. As she was moving into the left lane, a truck, which had been in front of her in the right lane, also moved into the left lane. To avoid a collision with the truck, Ivy abruptly steered left and then abruptly steered right and lost control of the Explorer. Ivy's efforts to avoid colliding with the truck caused her Explorer to roll, and she was ejected from the vehicle. As a result of her injuries suffered during the crash, Ivy is now a paraplegic.

The investigating police officer determined that the contributing factor to the crash was Ivy's loss of control of her vehicle, but no citations were issued. Holcomb Bridge Road is a flat, paved road and was dry on the day of the accident.

In September 1995, Ivy's mother, Ruby Bobo, purchased the Ford Explorer that Ivy was driving on May 22, 2006. From the time of purchase until the accident, Ivy and her family drove the Explorer. Prior to the accident, the Explorer was involved in several other accidents, in which the following damages were sustained: (1) $3,374 in damages caused by driving the Explorer under a tree in January 1998; (2) $1,722 in damages as a result of a rollover crash in April 1998; (3) $2,679 in damages from backing into a concrete barrier in February 1999; and (4) unknown damages from a December 2005 multiple-car crash near Holcomb Bridge Road arising from Ivy being cut off by another driver.

At the time of the 2006 accident, the Explorer was over ten years old and had an odometer reading of 185,428 miles. Ivy does not know how fast she was travelling at the time of the accident, but testified in her deposition that she thinks the speed limit was forty-five miles per hour and she was travelling with the flow of traffic. Shortly after the accident, the Explorer was released to Bobo's insurance company for salvage.

On May 20, 2008, Ivy filed this action against Ford in Gwinnett County State Court, alleging claims for failure to warn, strict liability and negligence arising from the defective design of the Explorer. Ivy also asserted claims for punitive damages and attorneys' fees. On June 20, 2008, Ford removed the action to this Court.

On May 28, 2009, Ford filed a motion for partial summary judgment, contending that it is entitled to judgment as a matter of law on Ivy's failure to warn, strict liability, and negligence claims.

On July 8, 2009, Ford filed another motion for partial summary judgment, seeking judgment as a matter of law on Ivy's punitive damages claim.

Also on July 8, 2009, Ford filed a motion to exclude Ivy's expert, Micky Gilbert. In his expert report, Gilbert opines that (1) the Explorer rolled over because it was defectively designed and unreasonably dangerous due to inadequate rollover resistance; (2) technologically and economically feasible design alternatives existed at the time the subject Explorer was designed; (3) Ford could have modified the Explorer by lowering the vehicle's center of gravity and/or increasing its track width as it has done on other Ford sport utility vehicles and as other SUV manufacturers have done; and (4) his suggested modifications would not adversely affect the Explorer's function or utility.

Ivy v. Ford Motor Co., 1:08-cv-2078-TCB, at 1–5 (N.D. Ga. Jan. 22, 2010) (footnote and docket citations omitted). In its January 22, 2010 order, the district court granted summary judgment in favor of Ford with respect to all of Ivy's claims, including the failure to warn, negligent design, and punitive damages claims.

Addressing Plaintiff Ivy's arguments on appeal, we turn first to her failure to

warn claim and then to her negligent design claim.[1]

## II. Failure to Warn Claim

The district court held that Ivy's failure to warn claim failed because it was undisputed that she had not read the warnings, and, therefore, the content of the warnings could not constitute a proximate cause of the accident.[2] Id. at 37. Ivy failed to address this holding in either the initial brief or her reply brief, and she is thus deemed to have waived any challenge to the district court's holding. See N. Am. Med. Corp. v. Axiom Worldwide Inc., 522 F.3d 1211, 1217 n.4 (11th Cir. 2008) ("Because [plaintiff's] brief on appeal fails to challenge this aspect of the district court's ruling, . . . [plaintiff] has waived the issue. This circuit has consistently held that issues not raised on appeal are abandoned."). Thus, Ivy's failure to warn claim fails.

## III. Negligent Design Claim

Ivy alleges that Ford was grossly negligent in designing, manufacturing, and selling the Explorer and negligent in the design, testing, manufacture, sale, and distribution of the Explorer. The Ivy's 1996 Ford Explorer was purchased in

---

[1] We reject Ivy's punitive damages claim in the final footnote of this opinion.

[2] See Dozier Crane & Machinery, Inc. v. Gibson, 644 S.E.2d 333, 336 & n.8 (Ga. App. 2007) ("Generally, where there is no evidence that a plaintiff read the allegedly inadequate warning, causation cannot be shown.").

September 1995, more than ten years before the accident date, May 22, 2006.

Georgia's statute of repose states, "No action shall be commenced pursuant to this subsection with respect to an injury after ten years from the date of the first sale for use or consumption of the personal property causing or otherwise bringing about the injury." Ga. Code Ann. § 51-1-11(b)(2). However,

> [t]he limitation of paragraph (2) of subsection (b) of this Code section regarding bringing an action within ten years from the date of the first sale for use or consumption of personal property shall also apply to the commencement of an action claiming negligence of a manufacturer as the basis of liability, *except an action seeking to recover from a manufacturer for injuries or damages . . . arising out of conduct which manifests a willful, reckless, or wanton disregard for life or property.*

Id. § 51-1-11(c) (emphasis added). " 'Willful conduct is based on an actual intention to do harm or inflict injury; wanton conduct is that which is so reckless or so charged with indifference to the consequences . . . [as to be the] equivalent in spirit to actual intent.' " Watkins v. Ford Motor Co., 190 F.3d 1213, 1216–17 (11th Cir. 1999) (quoting Chrysler Corp. v. Batten, 450 S.E.2d 208, 212 (Ga. 1994)). Ivy bears the burden of showing that this exception applies by a preponderance of the evidence. Id. at 1217 n.2.

We do not think that a reasonable trier of fact could find that Ford exhibited willful and wanton conduct when the vehicle in question, a second generation Ford

5

Explorer,[3] performed safely according to reputable mainstream sources. The National Highway Traffic Safety Administration ("NHTSA") has been researching the problem of SUV rollovers since 1973. While a great deal of time and expense has been put towards testing and decreasing the rollover propensity of SUVs, there has also been a great deal of uncertainty within the scientific and engineering community regarding what tests are most representative of real world situations and which vehicle measurements are most predictive of performance. After many years of study, in 2002, the NHTSA determined that two tests, the "J-Turn" test and the "Fishhook test, were "the most objective tests of the susceptibility of vehicles to maneuver-induced on-road rollover," and had "the highest levels of objectivity, repeatability and discriminatory capability." Consumer Information; New Car Assessment; Rollover Resistance, 68 Fed. Reg. 59,252, 59,253 (Oct. 14, 2003) [hereinafter NHTSA Report].

The NHTSA conducted J-Turn and Fishhook tests on 1995–2001 2-door and 4-door Explorers, both heavily and lightly loaded.[4] Id. at 59,255. The 2-door

---

[3] Ivy was driving a model UN-105, the second generation Explorer following the first generation UN-46.

[4] The lightly loaded condition was equivalent to "the test driver plus instrumentation in the front passenger seat, which represented two occupants." The heavy load condition varied by the vehicle's potential occupancy. Those vehicles capable of holding five occupants were generally tested with weight equivalent to five 175 pound passengers, while those capable of holding four passengers were tested with the weight of four. Because heavier loads are more

6

Explorer did not tip-up on any of the tests, either when lightly or heavily loaded. Id. The 4-door Explorer, which Ivy was driving at the time of her accident, did not tip-up in the J-Turn test, either lightly or heavily loaded, and it did not tip-up in the Fishhook test when lightly loaded. Id. Ivy's 4-door Explorer was lightly loaded at the time, carrying only herself as the driver. Although it did tip-up in the Fishhook test when heavily loaded, so did every other SUV tested except the 2-door Explorer and the Jeep Cherokee. Id. No SUV performed better than the 4-door Explorer, regardless of its Static Stability Factor ("SSF")[5] except the 2-door Explorer and the Jeep Cherokee. Id. The NHTSA did not indicate at the time this report was issued, and has not indicated since, that a vehicle is defective because it tips-up on the Fishhook test; the results merely inform what type of rating the vehicle will receive.[6]

Throughout the time that Ford was developing the Explorer, it was already

---

susceptible to tip-up, if a car tipped up in the lightly loaded condition, it was unnecessary to test it with a heavy load. Likewise, if a vehicle did not tip-up in the heavily loaded condition, it was not necessary to test it with a light load. See NHTSA Report, at 59,254–55.

[5] The SSF is recognized by the NHTSA as a valid measure of rollover resistance. Higher SSFs are generally correlated with a lower likelihood of rollover. The SSF is equal to the track width of the vehicle divided by two times the vehicle's center of gravity height.

[6] In fact, in the same report the NHTSA explained, "Our testing and logistic regression analysis was sufficient to assign a greater rollover risk to vehicles that tipped up in the most severe maneuver than to those that did not tip up at all. However, the extra risk was small . . . ." NHTSA Report, at 59,257.

using the J-Turn test—one of the two tests that was later determined to be most reliable and repeatable by the NHTSA—for internal safety and engineering purposes. The Explorer passed Ford's internal tests, including the J-Turn test, in addition to complying with all of Ford's requirements in advance of going to production. Upon its first appearance on the market in 1990, the Explorer also passed the separate Consumers Union Test and was recommended by Consumers Union. Then, in 2002, the second generation Explorer, the model driven by Ivy, performed well on the two tests the NHTSA concluded were best for evaluating susceptibility to rollover. Simply put, the Explorer performed well by all mainstream standards reflected on this record at the time it was marketed, and continued to perform well in testing done approximately five years after its release.

Ivy relies largely on our Watkins v. Ford Motor Company decision. 190 F.3d 1213 (11th Cir. 1999). In Watkins we held that a question of fact existed as to whether Ford acted with willful, reckless, or wanton disregard for life in its design of the Bronco II and, thus, reversed the district court's grant of summary judgment to Ford based on the ten-year statute of repose. Id. at 1220. However, the facts of this case are wholly distinguishable from the facts in Watkins. To begin with, Watkins dealt with an entirely different vehicle, the Bronco II. The Explorer has rated better than the Bronco II in a number of ways. With respect to the Bronco II,

<u>Watkins</u> recounted:

> In 1988, Ford's statisticians reported to management that the Bronco II had a rollover fatality rate $3\frac{1}{2}$ times that of a standard utility vehicle. Tests done in that same year showed the Bronco II tipping at speeds at which other similar vehicles remained stable. In 1991 the NHTSA published the results of five different static stability tests on 57 production vehicles and the Bronco II rated worst overall.

<u>Id.</u> at 1219. There is no comparable evidence regarding the Explorer. On the contrary, the Explorer has a wider track width and a higher stability index than the Bronco II. Def. Ford Motor Company's Reply to Pl.'s Resp. to Ford's Partial Mot. for Summ. J. Ex. 82-14, at 1 [hereinafter Explorer Handling Stability]. Additionally, while the Bronco II's performance on the Consumers Union Test was deemed "poor," the first generation of the Explorer passed the test and was recommended by Consumers Union. <u>See</u> <u>Consumer Reports</u>, September 1990, at 596–97, ECF 82-17. In fact, Ivy's expert, Micky Gilbert, conceded that the Explorer is more stable than the Bronco II (although he opined that this was irrelevant because he still argued it was dangerously unstable).

Most significantly, since the <u>Watkins</u> opinion was rendered in 1999, the NHTSA, after extensive study, finally identified in 2002 two tests which it deemed most appropriate for evaluating roll-over propensity, as discussed above—the J-

Turn test and the Fishhook test.[7] NHTSA Report, at 59,250. The 4-door Explorer not only performed within the same range as other similar SUVs, but actually performed better than any other SUV except for the 2-door model and the Jeep CJ. Id. at 59,255. Indeed, the 4-door Explorer lightly loaded (as was Ivy's vehicle at the time) performed at the same level as the 2-door Explorer and the Jeep Cherokee.

Also, in Watkins, there was evidence on the record that after Ford learned that there were "severe rollover and stability problems with the Jeep CJ—a vehicle the Bronco II was closely patterned after"—Ford engineers submitted five proposals geared towards increasing the stability of the Bronco II. Watkins, 190 F.3d at 1217. Management selected the least expensive proposal, resulting in a vehicle that was even less stable than the Jeep CJ. Id. Appellants' design expert specifically "stated that had Ford chosen proposal #5, at an additional cost of only $83.00 per vehicle, the Bronco II would have been a stable vehicle." Id.

While Plaintiff Ivy argues that "she presented evidence that Ford engineers recommended that the Explorer be modified to make it less rollover prone but that Ford rejected almost all of the proposed changes to avoid delaying 'Job 1,' the date

---

[7] Beginning with 2004 model vehicles, the NHTSA determined its Star Ratings by combining the SSF with results from the Fishhook test. It stopped using the J-Turn test for 2004 vehicle models and later because it determined that it did "not add any meaningful information to what is obtained from the fishhook maneuver test alone." NHTSA Report, at 59,250.

of first production," this proves to be an oversimplification and misstatement of evidence on the record. A retired Ford design engineer, Roger Simpson, in a deposition from a different case against Ford Motor Company cited by the Plaintiff, conceded that one reason that certain changes were not made to the Explorer was that delay in getting the vehicle to production was "unacceptable." Dep. of Robert Roger Simpson at 187–88, Jaramillo v. Ford Motor Co., No. 3:01-cv-5311-JKA (W.D. Wash. 2003), ECF 82-18. However, he stated that while "that was one of the considerations[,] [t]he other consideration was that that change did not offer that much improvement to the vehicle. In addition to the fact that we had already passed all internal corporate guidelines. [sic] The vehicle was acceptable and signed off from an engineering standpoint." Id. Likewise, a Ford development engineer, Hank Sleath, testified that while he was comfortable with the vehicle as it was, management requested changes because they wanted the Explorer to pass the Consumers Union Test, in spite of the fact that Ford felt the test was not repeatable or representative of real-world situations. Dep. of Henry W. "Hank" Sleath at 48–51, Curry v. Ford, No. CV-2006-150 (Cir. Ct. Ala. Deposed on Aug. 29, 2007), ECF 82-16 [hereinafter Sleath Dep.]; Explorer Handling Stability, at 1. While Sleath tested four proposed modifications, he recommended that only two of them be made and both were made. Sleath Dep. at 51–55. Thus, unlike Watkins, where

11

engineers put forth five proposals and the least expensive was accepted, in this case, the evidence does not indicate that Ford rejected safety proposals made by engineering; Ford made the two changes that were recommended.[8]

Although case law with respect to Ga. Code Ann. § 51-1-11(c) is sparse, Ivy acknowledges that the substantive standard for proving punitive damages is similar. In that similar context, the case law suggests that the wanton and willful standard is not satisfied where there is a bona fide dispute as to the propriety of the defendant's actions. See, e.g., MDC Blackshear, LLC v. Littell, 537 S.E.2d 356, 361 (Ga. 2000); Fickling & Walker Co. v. Giddens Constr. Co., 376 S.E.2d 655, 659–60 (Ga. 1989); Gilman Paper Co. v. James, 219 S.E.2d 447, 450 (Ga. 1975).

---

[8] Ivy identifies only two possible changes which were not implemented by Ford—i.e., making the track wider and further lowering the center of gravity. In light of the fact that the Explorer passed Ford's internal safety tests and passed the Consumers Union Test (and in light of the fact that the Explorer's performance on those tests was confirmed in 2002 when the Explorer performed well on the only two tests deemed appropriate by the relevant federal agency), there is insufficient evidence on this record from which a jury could conclude that Ford believed that the failure to make such changes presented significant safety risks. There is simply no evidence in this record of an intent on the part of Ford to do harm or of wanton conduct that is reckless or so charged with indifference to consequences as to be the equivalent in spirit of actual intent.

Moreover, making the track wider and further lowering the center of gravity obviously implicate the utility of the vehicle for off-the-road purposes. As we stated in Carmical v. Bell Helicopter Textron, Inc., "In design defects products liability cases, Georgia utilizes a risk-utility analysis, in which the risks inherent in the product design are balanced against the utility of the designed product and the manufacturer's reasonableness in choosing the design, including the probability and seriousness of the risk posed by the design, the usefulness of the design, and the burden on the manufacturer to take the necessary steps to eliminate the risk." 117 F.3d 490, 495 (11th Cir. 1997). Our Carmical panel was paraphrasing the Supreme Court of Georgia in Banks v. ICI Americas, Inc., 450 S.E.2d 671, 673 (Ga. 1994), which adopted the risk-utility analysis. In light of the foregoing evidence of the reasonableness of the instant design, there is simply insufficient evidence from which a jury could find wanton conduct.

Here Ivy has not even proved any significant dispute in the relevant time frame as to the propriety of Ford's actions. Rather, the record evidence shows that the Explorer passed Ford's internal testing, including the J-Turn test, passed the Consumers Union Test and received a recommendation in Consumer Reports, and that these positive results were replicated in 2002 when the Explorer performed well on the tests the NHTSA determined were most appropriate to evaluate rollover propensity. Where the Explorer is performing well according to these multiple evaluations, a reasonable juror could not find the  wanton and willful standard to be met. Cf. General Refractories Co. v. Rogers, 239 S.E.2d 795, 799–800 (Ga. 1977) (in the analogous punitive damages context, the Supreme Court of Georgia has said: "To allow punitive damages in a case such as this where the offender has taken all of the steps required by the supervising state authority and has expended substantial sums in doing so, would make the standard 'conscious indifference to consequences' a requirement without substance."). The evidence is undisputed that Ford was keenly aware of the rollover problem and had expended considerable effort to ensure that its product was within the guidelines considered by the industry and manufacturers at the time. As noted above, the only significant evidence adduced by Ivy is an after-the-fact opinion of her expert, Gilbert, which is discussed below.

The testimony of Ivy's expert, Micky Gilbert, while admissible, cannot create a genuine issue of material fact as to whether Ford's conduct was willful and wanton. Gilbert espouses a standard that is not accepted by any government agency or commercial manufacturer, and he generally oversimplifies a problem that the scientific and engineering community has been studying for some thirty years.

Also, in a case like this, where the vehicle at issue satisfied the two tests deemed most appropriate by the relevant federal agency and satisfied as well the Consumers Union Test, the mere fact that some expert might develop an after-the-fact opinion that the vehicle is defective is not sufficient to create a genuine issue of material fact as to whether Ford was willful and wanton with respect to marketing the vehicle. Although pressed at oral argument, Ivy could cite no case suggesting that an after-the-fact expert opinion under such circumstances could create a jury question as to wantonness. As a matter of common sense and common experience with respect to the meaning of wanton conduct, merely finding an after-the-fact expert to opine that a product is defective cannot be sufficient to create a jury question on the issue of wantonness—defined as willful conduct based on an actual intention to do harm or wanton conduct that is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit of actual intent—when the product satisfied the government and industry standards extant at

14

the earlier relevant time.  See Campbell v. Sikes, 169 F.3d 1353, 1370–71 (11th Cir. 1999) (in the somewhat analogous context involving the subjective component of deliberate indifference to an inmate's medical needs, this Court held that the plaintiff's after-the-fact expert opinion was not sufficient to create a jury issue.  We held: "allowing expert testimony that Sikes should or would have known to raise a jury issue as to whether he actually knew effectively would nullify Farmer's requirement of subjective mental intent. . . . The particular conflicting expert testimony here demonstrates only that there is a difference of opinion among professionals about what is accepted practice within the psychiatric community and what a doctor should or would know.").

There was no error in the district court's grant of summary judgment to Ford on either the failure to warn claim or the negligent design claim.

AFFIRMED.[9]

---

[9] Plaintiff Ivy also appeals the district court's grant of summary judgment to Ford on her punitive damages claim. "Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." Ga. Code Ann. § 51-12-5.1(b). Because the standard for awarding punitive damages is very similar to the standard for finding that Ford's conduct was willful or wanton in the design and manufacture of the Explorer, and because the former requires proof by clear and convincing evidence while the latter requires only proof by a preponderance of the evidence, Ivy's claim for punitive damages was also properly denied.

15