**SECOND DIVISION**
**MILLER, P. J.,**
**ANDREWS and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**May 24, 2018**

# In the Court of Appeals of Georgia

A18A0292. WOODS et al. v. A.R.E. ACCESSORIES, LLC

ANDREWS, Judge.

While working for Fayette County Fire and Emergency Services (Fayette Fire), Craig Woods suffered a head injury when the rear hatchback door on a pick-up truck cap installed over the bed of a Fayette Fire truck fell on his head as he stood behind the truck bed under the raised door. Woods and his wife (who asserted loss of consortium) brought a product liability action against A.R.E. Accessories, LLC (ARE), which manufactured the truck cap, and Custom Camper Manufacturing Company, Inc. (Custom Camper), which sold the truck cap and installed it over the bed of the pick-up truck. The action asserted strict liability and negligence claims on the basis that the truck cap was defectively designed, and alleged that there was a negligent failure to warn of the design defect. The trial court granted summary judgment in favor of ARE and Custom Camper. Woods and his wife appeal from the

grant of summary judgement to ARE.[1] We affirm because there was an absence of evidence in the record that the truck cap was defectively designed. Rather, undisputed facts showed that the truck cap door fell from the raised position and harmed Woods solely because it was damaged by Fayette Fire's unforeseeable misuse of the product.

Shortly after buying the pick-up truck, Fayette Fire bought the truck cap product from Custom Camper, which installed it over the bed of the truck on November 16, 2012. Thereafter, the truck and the truck cap were used by Fayette Fire on a daily basis without any problems until the truck cap rear door fell on Wood's head about a year later on November 17, 2013. The accident occurred when Woods raised the rear door to access the truck bed, and about 10 to 15 seconds later the door fell from the raised position and hit Wood's head. On November 8, 2013, nine days before the accident, Fayette Fire took the truck to a non-party company, 144th Marketing Group, LLC, which installed in the truck bed (under the ARE truck cap) a product known as the "Extendobed," a type of truck bed extender product. The Extendobed was designed as a shelf which rolled in and out of the truck bed (with the truck cap rear door in the raised position) to provide extended access to items placed

---

[1] Woods and his wife dismissed their appeal from the trial court's grant of summary judgment in favor of Custom Camper.

2

on the shelf. Immediately after the November 17 accident, Woods asked another Fayette Fire employee, Samuel Lindsey, to look at the rear door on the truck cap to determine why the door fell from the raised position. Lindsey examined the rear door and the recently installed Extendobed and determined: (1) that the door was held up in the raised position by two gas struts (one on each side of the door) which attached the door to the truck cap; (2) that the Extendobed installed in the truck bed had insufficient clearance between the Extendobed rails and the gas struts; and (3) that, when the Extendobed was rolled out of the truck bed with the rear door on the truck cap in the raised position, the Extendobed hit and dislodged a joint on one of the gas struts which caused the strut to detach from the door and caused the door to fall. Evidence showed that, although the remaining undamaged gas strut provided some resistence, it could not support the full weight of the door, so the door fell from the raised position. To confirm that this caused the door to fall, Lindsay reattached the strut joint to the raised rear door and physically rolled out the Extendobed while observing the Extendobed strike the strut joint on the driver's side strut. Lindsey also observed that this problem was evidenced by visible scratch marks on the driver's side strut where the Extendobed had previously hit the strut. As an immediate attempted fix, Lindsey bent the bracket attaching the strut to the truck cap to create

3

additional clearance between the Extendobed and the strut. Fayette Fire eventually cut and modified the Extendobed rails to allow clearance between the Extendobed and the gas struts.

The record shows that ARE distributed a truck bed extender product for pick-up truck beds with a slide-out shelf that was lower in height (six to eight inches off the truck bed) than the gas struts on the rear door of the ARE truck cap, and considerable lower in height than the "double-decker" height of the Extendobed product which hit and dislodged the gas strut on the ARE truck cap. Although ARE was aware of the use of other truck bed extender products on trucks using the ARE truck cap, ARE was not aware (prior to the accident) of the Extendobed company or its product and had no knowledge (until the accident) that the Extendobed had been installed on the Fayette Fire pick-up truck. Prior to the accident, there was a single instance of strut failure on an ARE product on a different product line where both struts on a door spontaneously failed without any impact, then immediately started working again, and ARE testing was unable to duplicate the failure. There was no evidence that, prior to the present accident, ARE had notice of a strut failure on any truck cap door (or other product line with a strut-supported door) caused by a strut being hit and detached by a truck bed extender product or any other object.

4

Woods provided the expert opinion of a professional engineer, who stated that the rear door on the ARE truck cap was defectively designed based on his conclusion: (1) that the installation of the Extendobed on the Fayette Fire truck was reasonably foreseeable; and (2) that the rear door on the ARE truck cap lacked various safety features that would have prevented the door from falling from the raised position when the Extendobed hit and damaged one of the gas struts supporting the door. According to the expert, ARE should have anticipated damage to the gas strut caused by possible impact with the Extendobed (or by possible impact from some other object) and should have (a) designed the struts on the rear door with a lock or latch mechanism that would have held the door in the raised position if a strut detached as result of damage, or (b) should have designed the rear door with two struts of sufficient strength that one undamaged strut would have held the door in the raised position if impact from the Extendobed (or other object) caused the other strut to fail. The expert conceded that he had never before analyzed or given any expert opinion regarding a failed door strut, and he admitted that he had never seen his suggested safety features incorporated on a truck cap rear door by any manufacturer. Moreover, the expert testified that his research showed that the Extendobed product at issue was custom-made for Fayette Fire based on specifications for a prior custom-made

Extendobed made for Gwinnett County. Although the expert testified that it was a misuse of the ARE truck cap for Fayette Fire to install and use the Extendobed product that impacted and damaged the gas strut on the truck cap rear door, he opined that the misuse was foreseeable.

Woods and his wife alleged that the ARE truck cap was defectively designed under theories of strict liability, negligence, and failure to warn. See *Jones v. NordicTrack, Inc.*, 274 Ga. 115, 115 (550 SE2d 101) (2001); OCGA § 51-1-11 (b) (1). A manufacturer has a duty to exercise reasonable care in the manufacture and design of its products "so as to make products that are reasonably safe for intended or foreseeable uses." *Chrysler Corp. v. Batten*, 264 Ga. 723, 724 (450 SE2d 208) (1994). And a manufacturer which (before or after the sale of its product) knows or reasonably should know of a danger arising from use of the product "has a duty to give warning of such danger." Id. at 724-725. "That duty requires warnings of nonobvious foreseeable dangers from the normal use of its products." *Certainteed Corp. v. Fletcher*, 300 Ga. 327, 330 (794 SE2d 641) (2016).

In considering a claim that a product was defectively designed, the risk-utility analysis adopted in *Banks v. ICI Americas, Inc.*, 264 Ga. 732 (450 SE2d 671) (1994)

"balance[s] the risks inherent in the product's design against the utility of the product so designed." *Jones*, 274 Ga. at 115.

> That [analysis] incorporates the concept of "reasonableness" and applies negligence principles to the determination of whether a product is defective for strict liability purposes. Thus, the distinction between negligence and strict liability is not significant for purposes of the risk-utility analysis.

*Ogletree v. Navistar Int'l. Transp. Corp*, 269 Ga. 443, 445 (500 SE2d 570) (1998) (citations and punctuation omitted). "The 'heart' of a design defect case [under the risk-utility analysis] is the reasonableness of selecting from among alternative product designs and adopting the safest feasible one." *Jones*, 274 Ga. at 118; *Banks*, 264 Ga. at 736. Thus, the risk-utility analysis "includes the consideration of whether the defendant failed to adopt a reasonable alternative design which would have reduced the foreseeable risks of harm presented by the product. [*Banks*, 264 Ga. at 736]; see the Restatement (Third) of Torts: Products Liability, § 2." *Jones*, 274 Ga. at 118. "[L]iability for defective design attaches *only* when the plaintiff proves that the seller failed to adopt a reasonable, safer design that would have reduced the foreseeable risks of harm presented by the product." *Banks*, 264 Ga. at 736 n.4 (citation and punctuation omitted; emphasis in original). Although *Banks* set forth a non-exhaustive list of factors for consideration by the trier of fact under the risk-utility

7

analysis, "*Banks* does not mean that adjudication as a matter of law is no longer appropriate in any case in which a design defect is alleged." *Ogletree v. Navistar Int'l. Transp. Corp.*, 271 Ga. 644, 646 (522 SE2d 467) (1999). Rather, to obtain judgment as a matter of law, the defendant must carry the burden "to show plainly and indisputably an absence of *any* evidence that a product as designed is defective." Id. at 646 (emphasis in original); *Certainteed Corp.*, 300 Ga. at 329.

"[U]nder Georgia law a manufacturer is not an insurer that its product is, from a design viewpoint, incapable of producing injury." *Banks*, 264 Ga. at 737. Rather, the "reasonableness" test at the heart of risk-utility analysis imposes liability for a design defect only where the manufacturer has failed to adopt a reasonable alternative design that would have reduced *foreseeable* risks of harm posed by the product. *Jones*, 274 Ga. at 118; *Banks*, 264 Ga. at 736; Restatement (Third) of Torts: Products Liability, §2 (b), cmt. d. The manufacturer's duty is to exercise reasonable care to design products "that are reasonably safe for intended or foreseeable uses." *Chrysler Corp.,* 264 Ga. at 724. Similarly, a product defect claim based on failure to warn of danger posed by the product requires warnings of foreseeable dangers from the normal use of the product. *Certainteed Corp.*, 300 Ga. at 330. As part of the risks of harm that manufacturers must foresee in choosing a product design, there is no

8

requirement that a product be made safe for a use that is unintended and unforeseeable. As the Restatement, supra, explains, liability may be imposed on the basis of design defect (or defect based on failure to warn of a danger arising from use of a product)

> only when the product is put to uses that it is reasonable to expect a seller or distributer to foresee. Product sellers and distributors are not required to foresee and take precautions against every conceivable mode of use and abuse to which their products might be put. Increasing the costs of designing and marketing products in order to avoid the consequences of unreasonable modes of use is not required.

Restatement (Third) of Torts: Products Liability, § 2, cmt. m.; see also Restatement, supra, at § 2, cmt. p. Because "virtually any article, of whatever type or design, is capable of producing injury when put to particular uses or misuses, a manufacturer has no duty so to design his product as to render it wholly incapable of producing injury." *Greenway v. Peabody Int'l. Corp.*, 163 Ga. App. 698, 700 (294 SE2d 541) (1982) (citations and punctuation omitted); *Hunt v. Harley-Davidson Motor Co.*, 147 Ga. App. 44, 46 (248 SE2d 15) (1978). Accordingly, a product manufacturer has no duty to design or warn against harm caused by an unforeseeable misuse of its product, and a product that causes harm as a result of unforeseeable misuse is not defective. Restatement, supra, at § 2, cmts. m. and p.; Vol. 2, Dobbs, Hayden, and Bublick, The

9

Law of Torts § 471, p. 983 (2d ed. 2011) ("[T]he product is not defective at all if the plaintiff's unforeseeable misuse is the sole cause of the harm."). On the other hand, reasonably foreseeable product use or misuse is a factor in considering whether a manufacturer may be liable for a defective product which was a proximate cause of harm resulting from the failure to adopt a reasonable alternative design (or from a failure to warn) to reduce the foreseeable risks of harm posed by the product. Id. at §2, cmt. p; *Jones*, 274 Ga. at 117-118; *Banks*, 264 Ga. at 736-737.

Applying these principles, we conclude that ARE was entitled to summary judgment.

> To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. The moving party may carry this burden either by (1) presenting evidence negating an essential element of the nonmoving party's claim, i.e., affirmatively disproving the element with evidence which makes it impossible for the [nonmoving party] to prove the element at trial; or (2) demonstrating an absence of evidence to support an essential element of the nonmoving party's claim. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue. On appeal, we review de novo the trial court's ruling on a motion for summary judgment, construing all facts and reasonable inferences therefrom in the light most favorable to the nonmovant.

*Parks v. Multimedia Technologies, Inc.*, 239 Ga. App. 282, 286 (520 SE2d 517) (1999) (citations and punctuation omitted); *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991); OCGA § 9-11-56.

Viewing the facts in the light most favorable to Woods and his wife, we conclude that ARE showed plainly and indisputably an absence of any evidence in the record to support a finding that the ARE truck cap was defective for purposes of the design defect claim or the failure to warn claim.

Undisputed facts show that the truck cap door fell from the raised position and hit Woods because of Fayette Fire's misuse of the truck cap product. The truck cap and the rear door on the cap performed as manufactured and designed by ARE for a year after Fayette Fire installed the cap over the bed of its pick-up truck. Then nine days after Fayette Fire installed the Extendobed in the bed of the truck under the truck cap, the rear door on the truck cap fell and hit Woods. The door fell because a gas strut supporting the door detached after being damaged by Fayette Fire's use of the Extendobed. The Extendobed was installed in the truck bed according to Fayette Fire's custom-made specifications, and was designed to roll out of the truck bed when the truck cap door was in the raised position. As installed, the Extendobed was so high and wide that, when it was rolled out of the truck bed, it hit, damaged, and

11

detached the gas strut supporting the raised truck cap door. Evidence showed that Fayette Fire's misuse of the Extendobed and the ARE truck cap under these conditions caused visible damage to the gas strut, and eventually caused the strut to detach, which caused the truck cap door to fall from the raised position and hit Woods.

We find no evidence in the record supporting a claim that the misuse of the Extendobed and the ARE truck cap was foreseeable to ARE.[2] ARE distributed a truck bed extender product, but that product operated at a much lower height (six to eight inches off the truck bed) than the Extendobed, and there was no evidence that the ARE bed extender product ever impacted or damaged the gas struts on the door of an ARE truck cap. Although it was reasonably foreseeable to ARE that other truck bed extender products would be installed and used in the beds of pick-up trucks over which the ARE truck cap product was installed, there is nothing in the record

---

[2] In considering the record on the foreseeability issue, we give no consideration to the expert opinion from the professional engineer produced by Woods that the product misuse was foreseeable. Expert opinion is admissible on issues where the conclusion of the expert is one which the average trier of fact would not ordinarily be able to draw for themselves – in other words the conclusion is beyond the ken of the average layman. *Raines v. Maughan*, 312 Ga. App. 303, 307 (718 SE2d 135) (2011). Whether or not the misuse was foreseeable to ARE was not "shrouded in the mystery of professional skill and knowledge," so no expert opinion was admissible on this issue. Id.

showing that, prior to the present accident, any truck bed extender product (or an object placed on the product) had impacted with or damaged struts on the door of an ARE truck cap product or similar product. Prior to the accident, ARE was aware of a temporary strut failure on one of its doors on a different product line that did not involve any impact to the struts. And prior to the accident, ARE had no knowledge of the Extendobed company, and was not aware that Fayette Fire had installed the custom-made Extendobed product in the truck bed under the ARE truck cap. Nothing in the record supports a finding that ARE had reason to foresee that Fayette Fire would install a custom-made Extendobed under the ARE truck cap, and then misuse the Extendobed and the ARE truck cap in the manner that caused the truck cap door to fail and harm Woods.

On these facts, the record shows as a matter of law that the ARE truck cap product was not defective for purposes of the design defect or failure to warn claims because the sole cause of the harm suffered by Woods was the unforeseeable misuse of the product. Although the trial court granted summary judgment in favor of ARE

on other grounds, we affirm under the right for any reason rule.[3] *City of Gainesville v. Dodd*, 275 Ga. 834 (573 SE2d 369) (2002).

*Judgment affirmed. Miller, P. J., and Brown, J. concur.*

---

[3] We affirm the grant of summary judgment on the loss of consortium claim brought by Woods's wife because it was derivative of the product defect claims brought by Woods. *Supchak v. Pruitt*, 232 Ga. App. 680, 684 (503 SE2d 581) (1998).

14